[Civ. No. 21972. Second Dist., Div. Three. Apr. 29, 1958.]

FLORENCE MORRIS et al., Respondents, v. ANNE H. BERMAN et al., Appellants.

Sydney Tannen, Wright, Wright, Goldwater & Wright and Dudley K. Wright for Appellants.

A. A. Rotberg for Respondents.

WOOD (Parker), J.—Action to establish a trust in real and personal property in favor of plaintiffs as heirs of Leo John Meyers, deceased, and for an accounting. The court found, among other things, that any purported interest of defendants in the properties was acquired by fraud and undue influence and was held in trust for decedent and his heirs. The judgment was that the properties are owned by the heirs of decedent and are subject to administration of his estate, and that the administrator of said estate recover $66,588.74 from defendants Anne H. Berman Meyers (the surviving wife of decedent) and Michael S. Berman (the son of Anne). Defendants appeal from the judgment.

Appellants contend, among other things, that the evidence does not support the findings above mentioned.

On August 19, 1939, Leo John Meyers married defendant Anne H. Berman Meyers. Leo had been married to Mollie Meyers. Two daughters, plaintiffs Florence Morris and Muriel Meyers, were born of that marriage. Leo and Mollie were divorced in 1928 and Mollie was given custody of Florence and Muriel. In 1932 Leo was given custody of Florence and Muriel and thereafter they resided with him. In 1935, when Florence married Nathan Morris, she left Leo's home.

A few days after the marriage of Leo and Anne, Muriel went to San Francisco and remained there about two years. In 1941 she returned to Los Angeles and resided with Leo and Anne about five days. She then moved to an apartment. Between 1945 and 1948, she visited Leo and Anne eight or nine times. In July, 1948, Leo and Anne visited Muriel. Muriel did not see Leo thereafter.

During the first few months after the marriage of Leo and Anne, they visited Florence and her husband, or Florence and her husband visited Leo and Anne, once or twice a week. Thereafter the visits were less frequent. Between 1941 and 1943, Florence saw Leo once. Between 1943 and 1945, Leo and Anne visited Florence a few times. About December, 1945, Leo and Anne met Florence and her husband at one of the apartment houses involved herein. Florence did not see Leo thereafter.

Anne had been married previously and a son, defendant Michael S. Berman, was born of the previous marriage. At the time of the marriage of Leo and Anne, Michael was about 12 years of age. Michael resided with Leo and Anne from March, 1940, until he entered the Navy in 1945.

At the time of the marriage of Leo and Anne, Leo was engaged in the finance and used car business, and he owned four parcels of real property, herein referred to as Parcels 1, 2, 7 and 10. Parcels 1, 2, and 7 were unimproved lots. Parcel 10 was improved with a store and two-unit apartment house.

On October 17, 1939, a grant deed, dated September 28, 1939, and signed by Leo, was recorded. That deed purported to convey Parcel 7 to Anne.

On December 6, 1939, a grant deed, signed by Mr. and Mrs. Kurclick, was recorded. That deed purported to convey two unimproved lots (herein referred to as Parcel 11) to Leo and Anne as joint tenants. Soon thereafter a house was constructed on the lots. On May 13, 1940, a declaration of homestead on Parcel 11, signed by Leo and Anne, was recorded.

On March 25, 1940, three grant deeds, dated December 15, 1939, and signed by Leo, were recorded. Those deeds purported to convey Parcels 1, 2 and 10 to Anne.

On April 23, 1939, prior to the marriage of Leo and Anne, one Goodman commenced an action against Leo. In February, 1940, the action was tried, and on April 23, 1940, a judgment for $15,545.83 was entered against Leo.

In September, 1940, Leo and Anne, individually and as "copartners operating under the name of L. J. Meyers Finance Co. also known as L. J. Meyers," filed a petition for an arrangement under chapter XI of the Bankruptcy Act. The schedules attached to that petition listed, among the assets, Parcels 1, 2, 7, 10 and 11. The values of those parcels, as given in the petition, were: Parcel 1, $1,000; Parcel 2, $5,000; Parcel 7, $2,000; Parcel 10, $10,000 and Parcel 11, $10,000. On June 25, 1942, the bankruptcy proceedings were terminated and possession of the assets then in the bankruptcy estate was restored to Leo and Anne. The record on appeal herein does not designate the value or nature of those assets, but the record indicates that the parcels of real property referred to above were restored to Leo and Anne. (On January 17, 1947, Parcel 11 was sold; and a trust deed, executed by the purchaser to secure her note for $10,000, was recorded. The note was payable to Leo and Anne as joint tenants.)

On November 5, 1942, four grant deeds, signed by Leo and Anne, were recorded. Those deeds, dated November 4, 1942, purported to convey Parcels 1, 2, 7 and 10 to Katherine Shostak and Sydney G. Shostak (Anne's sister and brother-in-law).

On September 19, 1944, a grant deed, dated November 10, 1942, and signed by the Shostaks, was recorded. That deed purported to convey Parcel 10 to Leo, Anne, and Michael, as joint tenants. (On January 12, 1948, Parcel 10 was sold; and a trust deed, executed by the purchasers to secure their note for $16,000, was recorded. The note, which was payable to Leo, Anne and Michael as joint tenants, will be referred to as Parcel 5d.) On August 6, 1946, a grant deed, dated November 28, 1942, and signed by the Shostaks, was recorded. That deed purported to convey Parcel 7 to Leo and Anne as joint tenants. (On August 6, 1946, Parcel 7 was conveyed by Leo and Anne to third persons.)

On November 19, 1948, a grant deed, dated December 15, 1942, and signed by the Shostaks, was recorded. That deed

purported to convey Parcels 1 and 2 to Leo and Anne as joint tenants.

On May 17, 1941, during the bankruptcy proceedings, Leo acquired record title to a lot improved with a 20-unit apartment house. That property is hereinafter referred to as Parcel 12. On September 30, 1942, Leo acquired record title to a lot improved with an eight-unit apartment house. That property is hereinafter referred to as Parcel 13. On September 19, 1944, two grant deeds, dated April 15, 1944, and signed by Leo, were recorded. Those deeds purported to convey Parcels 12 and 13 to Leo, Anne, and Michael as joint tenants. (On March 1, 1949, Parcel 13 was sold.)

On June 8, 1945, certificates for four shares of stock of Santa Carmelita Mutual Water Company were issued to Leo and Anne as joint tenants. On October 7, 1946, a certificate for four shares of stock of that company, was issued to them as joint tenants. Those certificates are hereinafter referred to as Parcel 5g.

Parcel 17 is a six-unit bungalow court. On August 22, 1945, Mrs. Shostak conveyed that parcel to Leo and Anne as joint tenants. Also on said date Leo and Anne conveyed that parcel to one Gonzales, who executed a trust deed thereon to secure a note for $8,250, payable to Leo and Anne as joint tenants. On February 20, 1946, Leo and Anne signed a document which stated that they held the trust deed for the benefit of Michael. (Apparently the note was paid before Leo died. Parcel 17 is not in controversy here.)

Parcel 14 is a single residence. On December 17, 1945, that parcel was conveyed by Mr. and Mrs. Erbacker to Leo and Anne, purportedly as joint tenants. (On February 8, 1948, Parcel 14 was sold, and the purchasers executed a trust deed thereon to secure their note for $14,000. The note, which was payable to Leo, Anne, and Michael as joint tenants, will be referred to as Parcel 5c.)

On June 20, 1946, a lot was conveyed by Mr. and Mrs. Schloen to Leo and Anne, purportedly as joint tenants. That lot, which adjoins Parcel 2, will be referred to as Parcel 2a.

On October 6, 1946, two lots, at La Quinta in Riverside County, were conveyed by the Shostaks to Leo and Anne, purportedly as joint tenants. That property will be referred to as Parcel 5f.

Between March 1, 1949, and February 26, 1951, certain third persons conveyed five additional parcels of real property to Leo, Anne, and Michael, purportedly as joint tenants.

Those parcels are referred to as Parcels 3, 4, 5, 15, and 16. Those parcels were, respectively, a 16-unit apartment house; a two-unit apartment house; an 18-unit apartment house; a single residence; a single residence. Parcel 15, a single residence, was sold March 1, 1949.

Rentals from the income properties, above referred to, were deposited in Leo's checking account.

In January, 1946, Leo opened a checking account in the Bank of America, and he was the only one authorized to sign checks on that account. On February 27, 1950, Leo underwent an operation for cancer. On March 3, 1950, while Leo was in the hospital, a representative of the bank went to the hospital, at the request of Anne, and interviewed Leo with reference to opening a joint account in the names of Leo and Anne. Leo wrote an "X" on a signature card and purportedly opened a joint tenancy account at the bank. (This account is referred to as Parcel 5e.) Leo and Anne were authorized to sign checks on that account. The balance in Leo's checking account, $880.41, was transferred to the joint account. Also, $4,250, which was in his savings account, was transferred to that account. In July and November, 1951, and March, 1952, Leo underwent further operations for cancer. He died on July 12, 1952. He was about 73 years of age.

At the time of Leo's death, the following described property was in the names of Leo and Anne as joint tenants: Parcels (of real property) 1, 2, 2a and 5f; Parcel 5g, the water stock; and 5e, the joint tenancy account of $6,892.74. At the time of Leo's death, the following described property was in the names of Leo, Anne, and Michael as joint tenants; Parcels (of real property) 3, 4, 5, 12 and 16; Parcel 5d, the note for $16,000 secured by a trust deed on Parcel 10; and 5c, the note for $14,000 secured by a trust deed on Parcel 14.

On July 14, 1952, the day of Leo's funeral, Anne withdrew $5,000 from the joint tenancy account in the bank.

Leo and Anne had opened an escrow on May 12, 1952, with reference to the exchange or sale of Parcels 12, 16, and 5c (being the 20-unit apartment house, a single residence, and the $14,000 note, which were in the names of Leo, Anne, and Michael.) Leo and Anne had signed escrow instructions which provided that Leo and Anne were to deliver, into the escrow, deeds to Parcels 12 and 16 and an assignment of the note and trust deed (Parcel 5c). Those instructions also provided that title to 18 lots (improved with 72 apartments—and subject to an encumbrance of $451,441.48), hereinafter referred

to as Parcel 6, would be conveyed to Leo, Anne, and Michael as joint tenants. Leo, Anne and Michael, signed and delivered into the escrow grant deeds to Parcels 12 and 16 and an assignment of the note and trust deed (Parcel 5c.) The spaces in those deeds and in the assignment, where the names of the grantees and the assignee were to be written, were left blank at the time Leo and Anne delivered the deeds and assignment into escrow. On July 31, 1952, after Leo's death, the escrow instructions were amended to provide that title to Parcel 6 was to vest in Anne and Michael as joint tenants. On August 1, 1952, after names of the grantees and the name of the assignee had been inserted in the blank space, the two deeds and the assignment of the trust deed were recorded. The grantees and the assignee, so referred to, were persons who are not involved in the controversy here. The deeds and assignment state that Leo, Anne, and Michael acknowledged, on May 12, 1952, that they executed the deeds and assignment. On August 1, 1952, Parcel 6 (the 18 lots with 72-unit apartment house thereon) was conveyed by Don Ja Ran Construction Company, Inc., and Kleefeld and Son Construction Company, Inc., as grantors, to Anne and Michael, purportedly as joint tenants.

In May or June, 1952, Leo left Parcel 5d (that is, the note secured by a trust deed on Parcel 10) and the trust deed and an assignment of the trust deed with William Eaton, an escrow clerk, so that those documents might be inspected by prospective purchasers. The assignment was signed by Leo, Anne, and Michael. Leo left no written instructions with the documents. On August 13, 1952 (after the death of Leo) Anne signed escrow instructions for the sale of the note and trust deed to Mr. King. At that time, the principal amount of the note was $10,847.79. The note was sold at a discount and the proceeds from the sale ($10,047.79) were paid to Anne. The assignment, which was dated August 12, 1952, states that Leo, Anne, and Michael acknowledged, on August 12, 1952, that they executed the assignment. (That date was after the death of Leo.)

On December 4, 1952, Michael was appointed administrator of Leo's estate. Thereafter he filed an inventory and appraisement of the estate which listed real property of the appraised value of $250, and listed personal property of the appraised value of $650. Creditors' claims against the estate, in the amount of $1,737.12, were filed and allowed.

On September 10, 1952, prior to the appointment of Michael as administrator of Leo's estate, Florence and Muriel com-

menced this action against Anne, Michael, and Audrey Jean Berman (Michael's wife) to establish a trust in real and personal property in favor of plaintiffs as heirs of Leo; and for an accounting. The defendants demurred generally, and on the grounds that the action was barred by laches and the statute of limitations. The demurrer was sustained with leave to amend. On January 9, 1953, plaintiffs filed an amended complaint wherein it was alleged that by fraud and undue influence, Anne and Michael induced Leo to transfer large sums of money and real property, which was Leo's separate property, to Leo, Anne, and Michael as joint tenants, and to acquire, with the proceeds from Leo's separate property, property in the joint names of Leo, Anne and Michael.

In the second cause of action it was alleged, in addition to the allegations of the first cause of action, that Leo received no consideration for the joint tenancy interests or property transferred to Anne and Michael.

The third cause of action alleged that the transfers of the joint tenancy interests were made by mistake of Leo as to the effect of the transfers.

The fourth cause of action alleged that defendants had acquired the rents, issues and profits from the real and personal property and had refused to account to plaintiffs therefor.

The prayer was for judgment declaring that defendants are trustees for each plaintiff as to one-third of the real properties; and ordering that defendants account for all other property which they unlawfully acquired from Leo, and that each plaintiff recover from defendants one-third of the value of such property.

Defendants demurred generally to the amended complaint, and also on the grounds that the action was barred by laches and the statute of limitations. The general demurrer to the third cause of action (*re* mistake) was sustained without leave to amend. The demurrer to the other causes of action was overruled. Defendants' answer was in substance a denial of the allegations of the amended complaint. Defendants did not plead affirmative defenses. On December 23, 1954, Anne filed a "Proposed Supplemental Answer" in which she alleged that the court has no jurisdiction of the subject of the action, and that "without prejudice to this defendant's additional defenses as by this defendant heretofore pleaded . . . all the property, title to which stands in the names of both this de-

fendant and Leo John Meyers, Deceased, and/or which belongs to both this defendant and said Leo John Meyers, deceased, is the community property of this defendant and said Leo John Meyers, deceased.''

. The court found, as follows: At the time Leo married Anne, he owned real and personal property of a value in excess of $150,000, and Anne did not own any property. During the marriage Anne did not acquire any separate property, and Leo and Anne did not acquire any community property. At the time of Leo's death, all property in which he had an interest was his separate property or was acquired from proceeds of his separate property. Prior to the marriage of Leo and Anne, a relationship of mutual love and affection existed among Florence and Muriel and Leo, and Leo made repeated statements that Florence and Muriel would be well provided for in the event of his death. From the inception of her marriage to Leo, Anne, pursuant to a plan and design to influence Leo against Florence and Muriel in order to obtain Leo's property for herself and Michael, began a course of conduct designed to estrange Leo from Florence and Muriel and to prejudice Leo against them and to cause Leo to place his trust and confidence in Anne and Michael, so that Leo would not give Florence and Muriel any of his money or property or provide for them when he died, and so that Anne and Michael would obtain all of Leo's money and property, and to thereby defraud Florence and Muriel of their just share of Leo's property and estate and to defraud Leo and obtain joint tenancy interests in his separate property to the personal benefit of Anne and Michael, and to render ineffective any will by which Leo could have devised his separate estate to Florence and Muriel. Commencing the day following Anne's marriage to Leo, Anne, pursuant to said design, and with the intention of forcing Muriel to leave Leo's home so that Anne could more easily influence Leo against Florence and Muriel and could dominate Leo, insulted and upbraided Muriel and within three days forced Muriel to move from Leo's home. In furtherance of said design, Anne brought Michael to live with Leo and Anne, and Michael lived with them for many years. In furtherance of said design, and for the purpose of keeping Leo away from his daughters, Anne upbraided and insulted the daughters to such an extent that she offended them, upset Leo, and isolated him from them. Pursuant to said design, Anne intercepted mail which the daughters sent him, refused to give such mail to him, and refused to inform

him of telephone calls from them. Between 1945 and the time of Leo's death on July 12, 1952, Anne prevented Leo and Florence from seeing or communicating with each other. Between 1949 and the time of Leo's death, Anne prevented Leo and Muriel from seeing or communicating with each other. Anne disliked Florence and falsely accused her of attempting to break up Anne's marriage. Anne stated repeatly that she would get all of Leo's money and that she would see that neither Florence nor Muriel would receive any of Leo's money. Immediately following the marriage, Anne began to and did dominate and control the relationship between Leo and his daughters; and Anne unduly influenced Leo and poisoned his mind against his daughters. Anne told Leo that Florence and Muriel did not love him and that they only wanted his money and were waiting for him to die so that they could get his money. By reason of the fiduciary relationship existing between Leo and Anne, and by reason of the confidence Leo had in Anne, Leo believed said statements and he was unduly influenced against his daughters. Said statements were false and were known by Anne to be false and were made for the purpose of influencing Leo against his daughters. Anne destroyed the affection which Leo had for Florence and Muriel and, as a result of the acts of Anne, Leo was deprived of the affection and advice of Florence and Muriel and he was left entirely to the will and control of Anne. In February, 1950, Anne knew that Leo was suffering from cancer and was confined to a hospital. In July and November, 1951, Leo was again hospitalized for further sur.-gery. Leo died on July 12, 1952. Anne, who knew how to communicate with Florence and Muriel, failed and refused to notify them of Leo's illness or death, or of the time and place of his funeral.

The court found further, as follows: Anne, for more than 10 years before her marriage to Leo, knew Sam H. Robinson, an attorney. A short time before Leo and Anne were married, Leo was involved in litigation, and Anne induced Leo to engage Robinson as his attorney. During that time, Robinson also acted as attorney for Anne and represented her in various legal matters; and Robinson, at Anne's request (apparently after marriage), prepared 12 conveyances of real property affecting the separate property of Leo. A fiduciary and confidential relationship existed between Robinson and Leo, and also between Leo (as one party) and Anne and Michael (as the other parties). Shortly after Anne's marriage to Leo,

Anne induced Leo to engage Sydney G. Shostak, her brother-in-law, to prepare income tax returns for Leo, Anne and Michael and to advise them on income tax matters. During approximately seven years prior to Leo's death, Leo engaged Shostak as his income tax advisor and accountant, and Shostak prepared all their income tax returns and advised Leo, Anne and Michael with reference to income tax and other matters. A fiduciary and confidential relationship existed between Leo and Shostak, and Leo had great trust and confidence in Shostak. In furtherance of said design and in order to defraud Leo, and in violation of the fiduciary obligations which Michael, Anne, Robinson and Shostak owed to Leo, and in order to defraud Florence and Muriel and to personally benefit Anne and Michael, Anne, Michael, Robinson and Shostak induced Leo (1) to sign documents which purported to transfer Leo's separate property to Leo, Anne and Michael as joint tenants, and (2) to acquire separate property in the names of Leo, Anne and Michael as joint tenants for the alleged purposes of minimizing taxes and preventing attachment of the property by Leo's creditors. In furtherance of said design to defraud Leo, to exclude Florence and Muriel from receiving their share of Leo's property, and to personally gain from said confidential relationship, Anne and her attorney Robinson induced Leo, (1) during the first four months after said marriage, to sign four grant deeds which purported to convey to Anne four parcels of real property which were Leo's separate property (Parcels 1, 2, 7 and 10); (2) they induced Leo to use his separate estate to acquire an additional parcel of real property by a deed which purported to vest title in the names of Leo and Anne as joint tenants (Parcel 11); (3) in 1942, Anne and her attorney Robinson induced Leo to join Anne in signing four grant deeds which purported to convey four parcels of Leo's separate property to the Shostaks (Parcels 1, 2, 7 and 10) and thereafter at the request of Anne, Robinson prepared, and the Shostaks signed and acknowledged, two grant deeds affecting two parcels of Leo's separate property (Parcels 1 and 2) which deeds contained no names of grantees, and Anne, in violation of her fiduciary obligation to Leo, altered said deeds and wrote in the names of Leo and Anne as joint tenants and caused the deeds to be recorded; (4) during 1942, at the request of Anne, her attorney Robinson prepared, and the Shostaks signed, two additional grant deeds which, purported to convey to Leo and Anne, as joint tenants, two additional parcels of property

which were Leo's separate property (Parcels 7 and 10). In furtherance of said design to defraud Leo, and to exclude Florence and Muriel from receiving their share of Leo's separate property, and to personally gain from said confidential relationship, Anne, Michael, Robinson, and Shostak induced Leo (1) in 1944 to sign two grant deeds which purported to convey to Leo, Anne and Michael, as joint tenants, two parcels of Leo's separate property (Parcels 12 and 13); and (2) in 1945 to acquire, with the proceeds of his separate property, a parcel of property under a grant deed which purported to convey the property to Leo and Anne as joint tenants (Parcel 14); (3) in 1948 to acquire, with his separate funds, a parcel of real property (Parcel 15) and a trust deed (Parcel 5c) which purported to vest title in Leo, Anne and Michael as joint tenants; (4) in 1949 to acquire, with his separate funds, three parcels of property under three grant deeds which purported to convey title to Leo, Michael and Anne as joint tenants (Parcels 3, 4 and 16); and (5) in 1951 to acquire, with his separate funds, a parcel of property under a grant deed which purported to convey title to Leo, Michael and Anne as joint tenants (Parcel 5). In 1952 during the last illness of Leo, and in furtherance of said design, Anne, Michael and Shostak induced Leo to sign two grant deeds covering two parcels of property (Parcels 12 and 16), and to endorse in blank two promissory notes (Parcels 5c and 5d) secured by two trust deeds, and to sign two assignments of the trust deeds. When Leo signed the deeds and assignments, those documents did not contain names of grantees or assignees. Those parcels of real property, the notes, and the trust deeds were the separate property of Leo but were standing in the names of Leo, Michael, and Anne as joint tenants. After Leo signed the deeds and the assignments, and after he endorsed the notes, he deposited the documents in an escrow pursuant to escrow instructions which were signed by Leo, Anne and Michael. (A later finding herein is to the effect that one of those notes, Parcel 5d, was delivered by Leo to an escrow agent, pursuant to his oral instructions, for inspection by prospective purchasers.) The escrow had not been completed at the time of Leo's death. After Leo died, Anne and Michael caused the two deeds and the two assignments of trust deeds, which Leo had signed, to be altered by inserting in the deeds the names of the grantees (persons not involved here) and by inserting in the assignments the names

of the assignees (persons not involved here) and by causing all of said documents to be acknowledged after Leo's death. Thereafter, Anne and Michael caused "the same" to be sold for their personal benefit, and they obtained title to Parcel 6 (the 72-unit apartment house) as joint tenants, and they obtained cash from the sale of one of said notes (Parcel 5d) and the trust deed securing that note. During the entire existence of Anne's marriage to Leo, she actively arranged for the preparation, and for the execution by Leo, of all deeds and all assignments of trust deeds under which interests in Leo's separate property were purportedly conveyed to Anne, or to Anne and Michael as joint tenants. Anne signed, and actively induced Leo to sign, escrow instructions which directed that title to Leo's separate property be conveyed to Leo and Anne, or to Leo, Anne, and Michael, as joint tenants. Anne and Michael unduly profited and gained an advantage over Florence and Muriel and obtained property of great value as a result of their said acts and conduct and the violation of their confidential relationship with Leo. Leo signed all of said grant deeds under which title to Leo's separate property was purportedly transferred to Anne, or to the Shostaks, or to Leo and Anne, or to Leo, Anne and Michael as joint tenants, and he accepted title to property under deeds and assignments of trust deeds which purported to vest title in Leo and Anne, or in Leo, Anne and Michael, as joint tenants, while acting under the complete domination and control of Anne, Michael, Sydney Shostak, and Anne's attorney, Robinson. Said grant deeds, trust deeds and assignments of trust deeds were procured by and through the undue influence and fraud of Anne and Michael imposed on Leo to such an extent as to completely subjugate his will and mind, so that said purported conveyances under which Leo acquired his separate property in the names of Leo and Anne, or Leo, Anne and Michael, were not the free and voluntary acts of Leo and were in violation of the fiduciary and confidential relationship which existed between Leo (as one party) and Michael, Anne, Robinson and Shostak (as the other parties).

The court found further, as follows: Leo never intended to make any gift of his said property to Katheryn or Sydney Shostak, or Anne, or Michael, and neither of the Shostaks, nor Anne, nor Michael, gave any consideration for said purported conveyances or transfers and each of "the same" was procured by the undue influence and fraud of Michael and Anne and the undue influence of Anne's attorney, Robinson,

and her brother-in-law, Sydney G. Shostak, to such an extent that the will and mind of Leo were completely subjugated. Leo never intended to transfer or convey to Katherine or Sydney Shostak, or to Anne or Michael any interest in his separate property, and Leo exercised complete and exclusive control over his said separate property. On March 3, 1950, in furtherance of said plan and design, Anne fraudulently induced Leo to sign an "X" on a bank signature card which purported to establish a joint tenancy bank account between Leo and Anne, and she fraudulently induced Leo to transfer to said account all the funds from Leo's separate bank account. Leo intended only to authorize Anne to pay his bills while he was temporarily disabled and did not intend to make Anne a joint tenant "in" his bank account or give her any interest in his funds. After Leo signed the signature card, he exercised sole control over the account and signed all checks thereon except those which he specifically authorized Anne to sign. During the entire period of Anne's marriage to Leo, Anne kept all the books and records relating to the income and property of Leo and had full knowledge of all Leo's income and property and used said knowledge for the benefit of herself and Michael in order to gain undue advantage over Leo and to defraud Florence and Muriel.

The court found further that at the time of his death, Leo was the owner of certain real and personal property, which are referred to in the findings as Parcels 1, 2, 3, 4, 5, 5a, 5b, 5c, 5d, 5e, 5f and 5g, and that said property was owned by Leo prior to his marriage to Anne, or was acquired from the rents, issues, profits and proceeds of property which Leo owned at the time of said marriage. Parcels 1, 3, 4, 5, 5f and 5g, referred to in the findings, are the same as the parcels referred to hereinabove (preceding the findings) by the same designations; Parcel 2, referred to in the findings, is the same as Parcel 2 and 2a, referred to above; Parcel 5a is the same as Parcel 12, referred to above; Parcel 5b is the same as Parcel 16, referred to above; Parcel 5c is the note for $14,000 secured by a trust deed on Parcel 14, referred to above; Parcel 5d is the note for $16,000 secured by a trust deed on Parcel 10 referred to above.

The court found further, as follows: In March, 1952, Leo delivered to an escrow agent a trust deed note for $16,000 having an unpaid balance of $10,847.79, herein described as Parcel 5d, payable to Leo, Anne, and Michael as joint tenants, with an undated assignment in blank signed by Leo, Anne, and

Michael, and an undated assignment in blank of a trust deed securing said note, signed by Leo, Anne, and Michael. At said time Leo gave oral instructions to the escrow agent to hold the same for inspection by prospective purchasers and to await his approval of written escrow instructions. On August 12, 1952, one month after Leo's death, Anne caused said documents to be altered by inserting the name of an assignee in the assignments of said note and trust deed, causing both instruments to be currently dated and acknowledged as to all the assignors, "including Leo John Meyers, who was then deceased," and she caused said note and trust deed to be sold for $10,047.79, and she and Michael retained the proceeds for their own use and benefit. Prior to July 12, 1952, Leo delivered into escrow uncompleted and acknowledged grant deeds to Parcels 5a and 5b (also known as 12 and 16) and an assignment in blank of the promissory note, Parcel 5c, secured by trust deed and an assignment in blank of the trust deed for use in connection with the acquisition of Parcel 6. About August 1, 1952, after Leo's death, Anne and Michael caused said documents to be altered by inserting in said deeds the names of the grantees and by inserting in said assignment of said trust deeds the names of the assignees, and caused said documents to be acknowledged and sold, and they used Parcels 5a, 5b, and 5c as the consideration for the acquisition of Parcel 6. Said Parcel 6 was acquired by Anne and Michael with the separate property of Leo, and they, (Anne and Michael) hold "the same" in trust for the heirs of Leo and "the same" is the separate property of Leo. Neither Michael nor his wife, Audrey, has any right, title or interest in any of the property described in the findings, and Anne has no right, title or interest therein except as an heir of Leo. Since Leo's death, Anne and Michael have jointly collected, retained and used the rents, issues and profits from Parcels 1, 2, 3, 4, 5 and 6 inclusive, and have retained and used the proceeds from the sale of the note and the trust deed, (the note being referred to as Parcel 5d), and they retained and used the bank account referred to as Parcel 5e, and they have refused to account to Florence and Muriel for such sums and for such property and they have wrongfully converted, retained and used $66,588.74 to the damage of the heirs of Leo and his estate. By reason of the undue influence exerted and the fraud practiced upon Leo by Anne, whatever purported interest Anne, Michael and Audrey acquired in the property, described in the findings, "was in fact acquired in

trust for and as trustee for" Leo, and "by reason of his death, for his heirs," Anne, Florence and Muriel, in equal shares. Michael and Audrey claim some interest in said real and personal property under and by virtue of said conveyances, and their claims are without right and they have no interest therein. Anne, as a surviving joint tenant, claims some interest in said property, and said claim is without right and Anne has no right, title or claim to said property except, as an heir of Leo, and she is entitled to share equally with Florence and Muriel in the separate property and estate of Leo, subject to administration. There was no community property acquired during the marriage between Leo and Anne.

The court found further that, except as otherwise specifically found, all the facts alleged in the first, second and fourth causes of action of the first amended complaint are true; and that the allegations of the defendants' amended answer to the first amended complaint, and the allegations of a supplemental answer of Anne, in conflict with the foregoing findings are untrue.

The judgment provided: (1) The grant deeds affecting Parcels 1, 2 (and 2a) from Leo to Anne, and the deeds from Anne and Leo to the Shostaks, and the deeds from the Shostaks to Leo and Anne, as joint tenants, are set aside and declared to be of no force and effect insofar as any purported interest therein of Sydney G. Shostak, Katherine Shostak, or Anne, Michael and Audrey "are concerned," and said property is declared to belong to, and be the separate property of, Leo and to belong to his heirs, subject to administration "in" his estate. (2) Any and all interests acquired by Anne, Michael, and Audrey in Parcels 3, 4 and 5 were obtained as the result of the fraud and undue influence of Anne and Michael, and were held in trust for Leo, and said property is the separate property of Leo and title thereto is in the heirs of Leo, subject to administration in his estate. (3) Any and all interests acquired by Anne in Parcels 5f and 5g were obtained as the result of the fraud and undue influence of Anne, and were held in trust for Leo, and said property is the separate property of Leo and title thereto is in the heirs of Leo, subject to administration in his estate. (4) At the time of his death, Leo was the owner, as his sole and separate property, of Parcels 5a, 5b and 5c, and any interest of Anne, Michael and Audrey therein was obtained as the result of the fraud and undue influence of Anne and Michael and was held in trust

for Leo; Anne and Michael. "having sold" said Parcels 5a, 5b and 5c and having used the proceeds to acquire Parcel 6, the title to said Parcel 6 is held by Anne and Michael in trust for the heirs of Leo, and title to said parcel is in the heirs of Leo, subject to administration in his estate. (5) At the time of his death, Leo was the owner, as his sole and separate property, of Parcels 5d and 5e; Anne and Michael sold Parcel 5d, and withdrew and used Parcel 5e and have collected and used the rents and profits from Leo's real property; and pursuant to the account (in this action) Anne and Michael, are indebted to the representative of Leo's estate, and the representative of Leo's estate shall have and recover from Anne and Michael, jointly and severally, the sum of $66,588.74, subject to administration in Leo's estate. (6) Anne, Michael and Audrey have no right, title or interest in Parcels 1, 2, (2a), 3, 4, 5, 5f, 5g and 6, except such interest as Anne may have as an heir of Leo. (7) Parcels 1, 2, (2a), 3, 4, 5, 5f, 5g and 6 are the separate property of Leo and title thereto is vested in the heirs of Leo subject to administration in his estate.

Appellants contend that the findings to the effect that they exercised undue influence upon Leo are not supported by the evidence. They argue that the fact that Leo and Anne were husband and wife did not raise a presumption of undue influence; the fact that Anne, by reason of the marriage relationship, may have had a strong general influence over Leo was not sufficient evidence unless undue influence was brought to bear directly upon the acts of Leo in executing the deeds and other documents; there was no evidence that Anne or Michael or anyone made false representations as to a material fact or exercised pressure which overpowered Leo's mind at the time the deeds or other documents were executed; there was no evidence that anyone exercised such influence over Leo that his acts in executing deeds, and purchasing property, in joint tenancy with Anne and Michael were not expressions of his own desires; four witnesses, with whom Leo had business dealings with reference to the property here involved, observed that Leo was acting according to his own will; there was no evidence that Anne took an unreasonable advantage over Leo or that Anne unduly benefited by the deeds she received; the trial court overlooked the consideration furnished by Anne, namely, 13 years of harmonious marital relationship, and her participation in Leo and Anne's business of buying and selling real property; the uncontradicted testimony of plaintiffs' and

defendants' witnesses rebuts any inference of undue influence and shows that Leo was acting according to his own will.

■ "In transactions between a husband and wife the rule with respect to confidential relations obtains (Civ. Code, § 158), and precludes either from obtaining an unfair advantage of the other through fraud, mistake, or undue influence. ■ Such transactions are considered subject to the rules which affect the relationship between a trustee and beneficiary; their relationship is in fact presumed to be confidential [citations], and where either obtains an advantage over the other, the transaction is presumed to have been without adequate consideration and to have been secured through undue influence, and the burden is then cast upon him who has the advantage to show that it was fair and free from fraud or undue influence." (*Dale* v. *Dale,* 87 Cal.App. 359, 364 [262 P. 339].)

: ■ "[T]he mere relationship of husband and wife does not constitute *prima facie* evidence of undue influence against the wife [citations], nor is there any presumption that a voluntary deed of conveyance or gift from husband or wife is the result of undue influence; and while it may be presumed that a wife has influence over her husband, this influence is not presumed to be undue (*McDougall* v. *McDougall, supra* [135 Cal. 316 (67 P. 778)]) unless it appears from the face of the transaction or from the proof that the marital confidence was used to take an unfair advantage or that this confidence was subsequently violated [citations]." (*Faria* v. *Faria,* 100 Cal.App. 177, 185 [280 P. 187]; see also *Buchmayer* v. *Buchmayer,* 68 Cal.App.2d 462, 467 [157 P.2d 9].)

■ In the present case there was a confidential relationship between Leo and Anne. The mere fact that there was a confidential relationship between them did not raise a presumption that Anne exercised undue influence over Leo in the transactions involved here. The court found that Anne unduly profited and gained an advantage as a result of her acts and conduct and the violation of her confidential relationship with Leo. There was evidence that at the time of the marriage Leo owned four parcels of real property and a finance company. The court found that the property he owned at said time was of the value of $150,000. There was evidence that at the time of the marriage Anne was the owner of a claim of approximately $2,000 against Sydney Shostak for money lent. The court found that at said time Anne did not own

any property. It is conceded that within four months after the marriage the title to four parcels (which Leo owned at the time of marriage) was in the name of Anne. Even though Anne testified that three of the four parcels were transferred to her as a gift, the court found in effect that the four parcels were transferred to her because she and others induced Leo to transfer the parcels for the purpose of preventing attachment of the property by Leo's creditors. After the bankruptcy proceeding was terminated, the four parcels were transferred to the Shostaks so that, according to the testimony of Anne, the Shostaks could retransfer the parcels in joint tenancy. Anne testified that she "told Leo that it would be a nice idea if we put it all in joint tenancy for him and for myself. My son [Michael] was a minor then [about 15 years of age], and someone advised him and advised me to put it through a third party—why, what, I don't know. That is why I gave it to Sydney Shostak and Katherine Shostak and they in turn gave us a deed back as joint tenants." By the deeds from the Shostaks, three of the parcels were in the names of Leo and Anne as joint tenants, and one of the parcels was in the name of Leo, Anne and Michael. As hereinabove shown, there was evidence that other property, acquired during marriage, was placed of record in the names of Leo and Anne, or Leo, Anne and Michael, as joint tenants. Anne testified that all the property, which was in joint tenancy, had been placed in joint tenancy because "we [Leo, Anne and Michael] had money together." The court found, however, that neither Anne nor Michael gave any consideration for the conveyances or transfers. According to the inventory in Leo's estate, filed by Michael, the administrator, the estate of Leo consisted of one parcel of real property, an automobile, and "Miscellaneous antiques," which were of the total appraised value of $900 at the time of Leo's death. The joint tenancy property included four apartment houses (16 units, 20 units, 18 units, and 2 units—subject to encumbrances), nine lots, two notes secured by trust deeds, four shares of water stock, and the bank account. It is to be noted that the apartment houses, the notes, and one lot were in the names of Leo, Anne and Michael. It is also to be noted that Michael, the son of Anne, was included as a joint tenant (as to several parcels of property) while he was a minor—when such legal disability would present an obstacle in the matter of a transfer, disposition, or recovery of the property. It was a question of fact for the trial court as to whether Anne unduly profited or gained an

advantage by reason of the confidential relationship that existed between her and Leo. There was substantial evidence to support the finding that Anne unduly profited and gained an advantage by reason of such confidential relationship. It appearing that there was a confidential relationship between Anne and Leo, and that Anne unduly profited and gained an advantage by reason of her confidential relationship, a presumption arose that Anne received joint tenancy interests in the properties as the result of undue influence. (See *Smith* v. *Lombard,* 201 Cal. 518, 524 [258 P. 55]; *Lyon* v. *Lyon,* 145 Cal.App.2d 660, 665 [303 P.2d 39]; and *Krug* v. *Meeham,* 109 Cal.App.2d 274, 278-279 [240 P.2d 732].) There was substantial evidence from which the trial court could infer that Michael received joint tenancy interests in the properties principally by reason of the acts of Anne. The first transfer of property whereby Michael received a joint tenancy interest was in 1942 when Michael was made a joint tenant with Leo and Anne in Parcel 10, which parcel had been Leo's separate property. At that time Michael was about 15 years of age, and there was no evidence that he participated in the procurement of the deed. In an annotation in 96 American Law Reports at page 613, it is said: "[A] gift, grant, or bequest procured by undue influence is vitiated thereby, and it is immaterial that in the procurement thereof the immediate beneficiary did not participate." That annotation cites, among other cases, *Moore* v. *Moore,* 81 Cal. 195 [22 P. 589], wherein a brother of a decedent obtained from decedent's widow deeds in favor of children of said decedent by a former marriage. In that case the widow sought to cancel the deeds on the grounds of her mental impairment and the undue influence of decedent's brother. It did not appear therein that the children participated in obtaining the deeds. The judgment of the trial court therein cancelling the deeds was affirmed. In the present case there was evidence that Leo placed trust and confidence in Michael. Anne testified that Leo trusted Michael and treated him like a son. There was further evidence that Leo trusted Michael in that Michael collected rents for Leo. There was substantial evidence to support the finding that a confidential relationship existed between Leo and Michael. Also, there was substantial evidence to support the finding that Michael unduly profited and gained an advantage by reason of the confidential relationship that existed between him and Leo, and by reason of the confidential rela-

tionship that existed between Anne and Leo. The question as to whether Anne and Michael or either of them overcame the presumption of undue influence was a question of fact for the trial court. (*Patterson* v. *Davis,* 121 Cal.App.2d 152, 159 [262 P.2d 601].) The court found that the joint tenancy interests of Anne and Michael were procured by their undue influence. By such finding it is implied that they did not overcome the presumption. The findings to the effect that Anne and Michael exercised undue influence are supported by the evidence.

 Appellants contend that the finding that Leo and Anne did not acquire any community property is not supported by the evidence. They argue that since all the property, except Parcels 1 and 2 and the $16,000 note, was acquired during marriage, there is a presumption that all the property, with those exceptions, was community property. They argue further that the evidence presented by respondents (Florence and Muriel) was not sufficient to rebut that presumption. It seems that appellants' argument is to the effect that the evidence does not support the finding that all the property was Leo's separate property or was acquired from proceeds of his separate property. In *Estate of Smith,* 86 Cal. App.2d 456 [195 P.2d 842] it was said, at page 470: "There are certain presumptions as to the community nature of property acquired after marriage (Civ. Code, § 164), but whether such presumptions have been rebutted is primarily a question of fact." In *Estate of Trelut,* 26 Cal.App. 2d 717, 723 [80 P.2d 147], it was said: "[A] finding of a trial court that property is either separate or community in character is binding and conclusive upon the appellate court, if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences. [Citation.] Further, a finding against a presumption is binding upon the appellate court [citation], unless the evidence to rebut it is so weak and improbable that the finding is without substantial support." Principles of law relative to the matter of determining whether property is community or separate property are stated in detail in *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116 [264 P.2d 626]. There was evidence that at the time of the marriage (in 1939) Leo was engaged in the finance and used car business; no profits were received from that business after the marriage; in 1940, the bankruptcy proceedings were commenced, and thereafter the assets of the business were

liquidated; Leo did not reengage in the finance or used car business; during the marriage he did not receive compensation for services; at the time of the marriage, Anne was employed as a bookkeeper in a garment factory and she continued working there; she sold antiques, at the family residence, from 1940 to 1947 and she made a profit of approximately $500 a year from those sales; in 1944 and 1945 she was employed by a cleaning and dyeing company from which she received $3,164.85 for her services; from 1947 to 1952 she conducted an antique and gift store; Leo assisted her in that business, which was operated as a partnership consisting of Leo, Anne and Michael; income tax returns filed by them, as such partners, showed losses from that business amounting to $11,663.78; Leo's medical expenses in 1950, 1951, and 1952 amounted to $9,879.05. There was no evidence as to amount of the living expenses during marriage. Anne testified to the effect that she could not estimate the amount of such expenses; that their living expenses were not high but were moderate in amount. ▄▄▄ A husband may properly pay the living expenses of the family from community earnings, if any, and preserve his separate property. (*Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116 [264 P.2d 626].) ▄▄▄ "Evidence that there was no excess of community income over living expenses is as effective to prove that all assets of the estate are separate property as a specific showing from which separate source each asset flowed." (*Estate of Ades,* 81 Cal. App.2d 334, 339 [184 P.2d 1].) ▄▄▄ In the present case the court could infer from the evidence that the living expenses exceeded the community earnings. As above stated, it was a question of fact for the trial court as to whether there was community property. The evidence was sufficient to support the findings to the effect that there was no community property, and that all the property was Leo's separate property.

▄▄▄ Appellants argue further that when Leo sold Parcel 7 in 1946 and Parcel 10 in 1947 he was in the business of buying and selling real property, and that the profits from those two transactions were attributable to his managerial skill and therefore a portion of such profits was community property. Those parcels were owned by Leo before the marriage, and the sale of them after marriage was, of course, a sale of his separate property. The court was not required to apportion a part of the profits therefrom as community property.

Appellants contend that the causes of action were barred by the statute of limitations and laches. They argue that all the transactions, except the one involving Parcel 5, occurred more than three years before Leo's death, and that the transactions, except those involving Parcels 3, 4, and 5, occurred more than four years before Leo's death. The defenses to the effect that the causes of action were barred by the statute of limitations and laches were not pleaded. About three and one-half months after the trial, but before the findings and judgment were signed, defendants made a motion, under the provisions of section 472 of the Code of Civil Procedure, to amend the answer by alleging that the causes of action were barred by the statute of limitations and laches. (That section pertains to an amendment before "the answer or demurrer is filed." Presumably the defendants intended to make the motion under Code Civ. Proc., § 473.) Whether or not the motion should be granted was a matter within the discretion of the trial judge. The motion to amend was denied. As hereinabove stated, the defendants had demurred to the complaint and amended complaint on the grounds, among others, that the causes of action were barred by the statute of limitations and laches. The demurrers were overruled, and as above stated, the defendants did not plead those defenses in their answer. It was alleged in the amended complaint, among other things, that Anne entered upon a plan to obtain Leo's property; Leo had great confidence in Anne and Michael; commencing shortly after the marriage Leo, relying upon the great confidence he had in Anne and Michael and under their undue influence, transferred from time to time large sums of money and joint tenancy interests in real property to Anne and Michael. The court found, in effect, that from the time of the marriage and pursuant to Anne's plan to obtain Leo's property, Anne and Michael exercised undue influence upon Leo and obtained from him, at various times from the marriage to and including 1951, joint tenancy interests in his separate property. The court also found that Anne and Michael held the property as trustees for Leo and his heirs. The confidential relationship and the undue influence having continued, as found by the court, and the property having been held by Anne and Michael as trustees, it appears that the causes of action were not barred by the statute of limitations or by laches. "As a general rule, the statute of limitations does not run where the parties occupy a fiduciary relationship toward each other and

the relationship has not been repudiated or terminated by the parties. This rule is applicable to resulting trusts. . . ." (31 Cal.Jur.2d p. 451, § 22; see also *Estate of Clary*, 203 Cal. 335, 341 [264 P. 242].) ▇▇▇ In *Estate of Hettermann*, 48 Cal.App.2d 263 [119 P.2d 788], a question was whether a will was made under the undue influence of decedent's wife. On appeal therein it was held that the evidence was sufficient to support the jury's finding that the will was made under the undue influence of the wife. It was said therein at page 273: "It appears that decedent lived nearly 15 years after he executed the will, but this fact also, while it should be considered by the jury in passing on the question, does not necessarily prove that the will was not the product of undue influence. [Citation.] The jury may have thought that the influence persisted through these years and prevented any change of the will." In *San Joaquin Valley Bank* v. *Dodge*, 125 Cal. 77 [57 P. 687], it was said at page 84: "Amendments to pleadings are left much to the discretion of the court below, and it is presumed that such discretion will always be exercised in furtherance of justice and with the end in view of disposing of cases upon their merits. We cannot interfere except in cases where such discretion is abused. In view of the fact that the application was made after the case had been submitted and was made for the purpose of allowing defendant to plead the statute of limitations, we cannot say that the court abused its discretion." In the present case it cannot be said that the trial judge abused his discretion in denying the motion to amend. The judge did not err in overruling the demurrer.

▇▇▇ Appellants contend that the court erred in determining the issues in the exercise of its general equity jurisdiction. They argue to the effect that since they made timely objection to a hearing by the court in the exercise of its equity jurisdiction, the issues should have been determined by the court in the exercise of its probate jurisdiction. It appears that Anne pleaded in her supplemental answer that the superior court (as a court of equity) did not have jurisdiction of the "subject of the action." It also appears that at commencement of the trial the attorney for appellants objected to the hearing of the matter by the court in the exercise of its equity jurisdiction, and he argued that the matter should be heard in the exercise of probate jurisdiction. (It is not clear whether the objection was on behalf of the three defendants, Anne, Michael, and Michael's wife, or only on behalf of

Anne. It will be assumed that the objection was intended to be on the behalf of the three defendants.) Appellants cite *Schlyen* v. *Schlyen*, 43 Cal.2d 361 [273 P.2d 897], wherein a will contest and an action to cancel deeds were consolidated for trial. In that case the defendant did not object, until after judgment, to the trial of the deed issues in the exercise of general equity jurisdiction. The court held therein (p. 378) that defendant had waived the objection. It was said therein, at page 378: "[T]hat in the absence of a demurrer, answer . . . or other timely objection on the ground that the issues involved should be tried in probate, the superior court may adjudicate those issues with the same force and effect as if the objection had not been made; . . . that when as here the issues pertain only to the rights of parties in privity with the estate and do not involve the rights of third parties or strangers to the estate the superior court sitting in probate has jurisdiction and should adjudicate them, but that such jurisdiction is not exclusive, depending on the facts of the particular case and may be waived." Appellants, in the present case, argue that the Schlyen case supports their contention that the matter should have been heard "in probate," and not in equity since they made timely objection to a trial by the superior court in the exercise of its equity jurisdiction. In the Schlyen case the widow was the only defendant and, although she was sued individually, she was also the personal representative of the estate. As hereinabove shown, the court in the Schlyen case said in effect that all the parties therein were in privity with the estate and that the matter should have been heard in probate if a timely objection to hearing the matter in equity had been made. In the present case Anne, the widow, was one of the defendants but she was not the personal representative of the estate, and she was claiming title to the joint tenancy property as against the estate. A further respect in which the present case is distinguishable from the Schlyen case is that Audrey Jean Berman, the wife of Michael, who is a party defendant, is not in privity with the estate. In *Merola* v. *Superior Court*, 125 Cal.App.2d 1 [269 P.2d 664], the superior court in the exercise of its probate jurisdiction made an order directing the widow to deliver certain bonds to the executor, and declaring that the bonds were the property of the estate. The court said at page 4: "The widow claims that the property involved is her sole property; i. e., that some of it was given to her by the decedent during his lifetime and that the rest of it upon his

death became her sole property as the surviving joint tenant. She claims adversely to the estate, not in privity with it, and is not a personal representative of the estate claiming title in her individual capacity. The contest, therefore, is between the estate and a stranger to the estate, and the principle that the probate court may not try title applies.'' In *Central Bank* v. *Superior Court,* 45 Cal.2d 10 [285 P.2d 906], it was said at page 14: ''It is the general rule that the superior court while sitting in probate is without power to decide a disputed claim between an estate and a stranger thereto.'' In the present case Anne is not a personal representative of the estate, and, with respect to her adverse claim to the alleged joint tenancy property, she is not in privity with the estate but is a stranger thereto. In *Central Bank* v. *Superior Court, supra,* it was said at page 17: ''But a surviving wife's claim to her share of the community property is said to come to her through probate (Prob. Code, § 202) so that her claim is in privity with the estate and should be litigated therein.''

In the present case, however, it is to be noted that, in the supplemental answer filed by Anne, she alleged that the property was community property. In the prayer of her supplemental answer she stated: ''That if the Court finds against this defendant as a surviving joint tenant, then, that the Court order that all of the property . . . is the community property'' of Anne and Leo. She presented evidence on the subject of community property. The court did not err in determining the issues in the exercise of its equity jurisdiction.

Defendants state in their notice of appeal that they appeal from the ruling on their demurrer to the first amended complaint. Such a ruling is not an appealable order. (*Lavine* v. *Jessup,* 48 Cal.2d 611, 614 [311 P.2d 8].)

The attempted appeal from the ruling on demurrer is dismissed. The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied May 15, 1958, and appellants' petition for a hearing by the Supreme Court was denied June 25, 1958.