[Civ. No. 20732. First Dist., Div. One. Feb. 13, 1963.]

Estate of IRA W. NEY, Deceased. LORETTA M. NEY, Plaintiff and Appellant, v. IDA M. MORGAN, Defendant and Respondent.

Elkins & Wright for Plaintiff and Appellant.

Albert T. Shine, Jr., and Robert H. Moran for Defendant and Respondent.

BRAY, P. J.—Appellant appeals from judgment (jury waived) determining that all of the assets of the estate of

Ira W. Ney were the separate property of decedent, and over-ruling appellant's exceptions to the report accompanying first and final account and petition for distribution.

## QUESTIONS PRESENTED

Are the assets of the estate separate property?

(a) Is the present estate traceable to Ira's separate property at marriage?

(b) Was the enhancement natural or due to Ira's skill and ability?

(c) Was there an agreement to change property status?

## RECORD

Appellant and Ira W. Ney were married May 20, 1946, both being then over 60 years of age. They remained married and living together until Ira's death, October 19, 1960. Ira left a will dated December 8, 1954, in which he declared that all property then owned by him was separate property. He bequeathed to his wife $3,000 provided that she accept that sum in lieu of any community interest, and $3,000 conditionally to the Shriner's Hospital for Crippled Children. The residue of his estate he left to sisters and nieces. The estate, consisting almost entirely of common stocks registered in Ira's name, was appraised at $73,265.92. In the report accompanying the final account and petition for distribution the executrix alleged the estate to consist of separate property and asked distribution in accordance with the will. Appellant filed objections alleging the estate to consist of community property of herself and Ira and asked distribution accordingly.

The court found as follows: Neither plaintiff nor decedent was employed for wages or salaries following the marriage, decedent having retired previously from a clerical position with a utility company. Ira received monthly, during marriage: army pension, $105; social security, $54; P.G. & E. retirement, $14; total, $173. At the time of the marriage Ira's net worth was at least $39,463.78, consisting entirely of stocks, bonds, and cash. During the marriage decedent invested practically all of his separate assets in common stocks. From time to time he sold certain stocks and bought others. None of the stocks registered to decedent at death were the same stocks which he had at the time of marriage, but said stocks were acquired by him with the proceeds and profits of his separate estate through a series of sales and exchanges made during marriage. During the period of the marriage the

Dow Jones averages on industrial stocks increased from 207.60 to 582.69. The increase in the value of his stocks was not due to his skill, knowledge, or effort in trading stocks but to the natural enhancement of common stocks during the pertinent period. Decedent contributed approximately $500 a month to the living espenses of appellant and himself as well as paying for extended trips to Europe, Hawaii, Florida, and Los Angeles. Any income which could be attributed to decedent's skill in trading stocks would be considerably less than the living expenses contributed by decedent during marriage.

The court then overruled appellant's objections and decreed that all of the assets in the estate were Ira's separate property.

## SEPARATE PROPERTY

 Appellant points out that there is a presumption that property left by a decedent which was acquired after marriage is community property; that the presumption has greater force where the marriage is of long duration (here 14 years), and that the burden of proof is on the one claiming the estate to be separate property. (*Estate of Duncan* (1937) 9 Cal.2d 207, 217 [70 P.2d 174]; *Estate of Jolly* (1925) 196 Cal. 547, 553 [238 P. 353].) However, the "issues and profits from separate property and the increase in value thereof are separate property under Civil Code, section 163 (*Huber* v. *Huber, supra,* 27 Cal.2d 784 [167 P.2d 708]) and as such are not subject to the community property presumption under Civil Code, section 164." (*Mears* v. *Mears* (1960) 180 Cal.App.2d 484, 506 [4 Cal.Rptr. 618].)

 "The capital which the husband brings to the marriage partnership is his own separate property, but it is a question for the court to determine what portion of the profits thereafter arises from the use of this capital and what part arises from the activity and personal ability of the husband. That portion of the income due to the 'personal character, energy, ability and capacity of the husband' is community property. [Citations.]" (*Witaschek* v. *Witascheck* (1942) 56 Cal.App.2d 277, 281 [132 P.2d 600].) There is no apportionment where the increase in value or income is attributable solely to the natural enhancement of the property. (See *Estate of Cudworth* (1901) 133 Cal. 462, 468 [65 P. 1041]; *Morris* v. *Berman* (1958) 159 Cal.App.2d 770, 793 [324 P.2d 601].)

Under the foregoing rules we are confronted with the questions: (a) Is the present estate traceable to Ira's separate

property at marriage? (b) Was the enhancement in value natural or due to Ira's skill and ability?

*(a) Property traceable.*

Ira received during the marriage approximately $173 per month in retirement and social security benefits. As these were based on services rendered prior to marriage, they were separate property. (See *Gettman* v. *City of Los Angeles Dept. of Water & Power* (1948) 87 Cal.App.2d 862 [197 P.2d 817].) Neither spouse received wages or salaries. While there was no exact tracing thereafter of each particular stock or amount of money which Ira had at the time of marriage, he had during marriage no other source of income than the above. Appellant testified that she thought that Ira's assets when they married were the value of $10,000. However, her testimony was not too definite. Moreover, the evidence shows that in 1944, Ira inherited 200 shares of P.G. & E. Co., valued at the time of the marriage at $8,800. He sold this in 1948. At marriage, he had on deposit in banks $9,750.93. Decedent's accountant's testimony shows that between December 1944 and October 1946 Ira acquired certain stocks of a value of approximately $20,913, which were disposed of between 1951 and 1956. Thus, a reasonable inference is that decedent was worth over $39,000 when he married. Whatever Ira's worth then was, his assets at the time he died could only have come from the increase of, and proceeds from, the assets he had at the time of marriage, plus the $173 per month above mentioned. So it was unnecessary to trace the path of any particular stock or moneys. At the time of death Ira's estate consisted of common stocks and bonds plus approximately $1,000.

For the 10-year period, 1951-1960, for which records were available, there were capital gains of $24,604.04 and dividends received in the sum of $44,450.25. These figures, however, included returns from appellant's stock which at the time of Ira's death had a value of about $20,000. There was no commingling of funds. Except for a small joint bank account each spouse kept separate bank accounts. Appellant knew that one of Ira's bank accounts was a joint one with his sister. At marriage, appellant was possessed of separate real property, stock and cash, which she kept in her name during the marriage, and the proceeds from which she deposited in her own account. The spouses maintained separate records concerning their holdings, and the dividends and gains relat-

ing thereto. For at least 10 years during marriage their federal income tax returns were filed in their joint names. However, "Joint returns filed in 1948 and subsequent years are no evidence of transmutation. Since that year husbands and wives in all states have been permitted to file joint returns and split their income whether the income reported is separate or community." (*Estate of Neilson* (1962) 57 Cal.2d 733, 744, fn. 2 [22 Cal.Rptr. 1, 371 P.2d 745].)

The spouses lived in appellant's home. Appellant estimated that Ira contributed about $500 per month for repairs, painting of his wife's home, food, utilities, and travelling. However, under the evidence the court could and did conclude that the cost of the travel of the spouses was in addition to the estimated $500 per month for the other expenses. For several years appellant paid the taxes on the home; thereafter decedent did. Appellant had an income of approximately $50 per month at marriage. This was increased by dividends on her own stock up to between $900 and $1,200 per year. At Ira's death appellant had assets of $55,743, $30,000 of which was the value of her home. From an initial investment of $5,300 of her separate moneys, she acquired during marriage stocks of the value of $20,743. Decedent handled her investments.

It is clear that each spouse kept his or her initial assets, the dividends and increase thereof, separate from those of the other spouse, except that Ira used some of his for the living and travel expenses of both. The finding concerning Ira's separate estate is well supported unless the evidence shows that the increase in his estate was due to his skill and ability. This brings us to the second question:

(b) *Was the enhancement a natural one?*

Although, as shown, the presumption that property acquired after marriage is community property does not apply to increase in separate property, nevertheless where such presumption applies, the trial court's determination that there is sufficient, clear, and satisfactory evidence to rebut the presumption must be accepted as conclusive by the reviewing court if there is substantial evidence to support it. (*Thomasset* v. *Thomasset* (1953) 122 Cal.App.2d 116, 123 [264 P.2d 626].)

The record shows some 150 stock transactions in a 10-year period. (No records were presented in regard to the first four years.) Decedent did not devote full time to the

market, visiting his broker on the average of once a week when at home, and sold stock on the average of once a month. He read the Wall Street Journal daily when home. A considerable portion of the time he and appellant were away on extended trips. The evidence fails to disclose that Ira had any special abilities, skill, or knowledge in the trading of stock. In the 14 years his estate grew from $39,000 to $73,000, less than doubling. During the same period the Dow Jones industrial average increased from 207.60 to 582.69, that is, almost tripled.

As pointed out in *Cozzi* v. *Cozzi* (1947) 81 Cal.App.2d 229, 232 [183 P.2d 739], it is not the increase during marriage in the value of a husband's separate property and the proceeds from that property that may become community property, but only that portion of such increase and proceeds as is directly attributable to the husband's skill and ability. Where the wife fails to produce evidence as to what proportion of that increase and proceeds is attributable to the husband's skill rather than to natural enhancement the court may properly determine that any portion thereof attributable to the husband's skill was expended by him in the support of the wife and in living expenses. "It is presumed that the expenses of the family are paid from community rather than separate funds." (*Estate of Neilson, supra,* 57 Cal.2d 733, 742.)

As said in *Morris* v. *Verman, supra,* 159 Cal.App.2d 770, 793, "In the present case the court could infer from the evidence that the living expenses exceeded the community earnings." The court in the case at bench did find: "Any income during the marriage which could be attributed to decedent's ability, skill or effort in trading stocks would be considerably less than the living expenses contributed by the decedent during marriage."

In *Cozzi* v. *Cozzi, supra,* 81 Cal.App.2d 229, all the real property, stocks and bonds owned by the husband at the time of the divorce were acquired by him with separate funds which he had prior to the marriage. During marriage the husband "devoted his full time to the management and upkeep of his property. A portion of plaintiff's [the wife's] time was likewise utilized in collecting rents and otherwise assisting her husband in caring for the real property." (P. 231.) In upholding the trial court's determination that all the property in the husband's name was his separate property the court said (pp. 232-233): "Assuming the care

and maintenance of income properties owned by him to be a 'business,' it is not the profits of the business, but only the ascertained earnings of the defendant from his individual efforts in managing, laboring on and caring for such property, in the nature of salary, wages or the equivalent thereof, which would be community property. (*Seligman* v. *Seligman, supra* [85 Cal.App. 683 (259 P. 984)], p. 687.) No evidence has been called to our attention appraising the value of plaintiff's such 'earnings' or to what proportion of the income they should properly be allocated. In finding all the property, including the increments through income, to be separate property of the defendant, the trial court was entitled to take into consideration the fact that any so-called earnings which might have accrued to the community by virtue of the work, labor or services of defendant, may well have been expended by him in the support of his wife and child, thus leaving his separate estate intact. (*Cline* v. *Cline,* 4 Cal.App.2d 626, 629 [41 P.2d 588]; *Conard* v. *Conard,* 5 Cal.App.2d 91, 93 [41 P.2d 968].) The evidence supports such an inference and we are unable to say that the court abused its discretion or committed error in finding for the defendant on this issue.''

The same situation exists in our case. The evidence shows that the increase in the value of Ira's estate was due more to natural enhancement than to any special skill or ability on his part in trading stocks, and that moreover, the value of the results of any skill or ability he may have had was far less than the amounts he expended for the living and travelling expenses of appellant and himself.

*Estate of Adams* (1955) 132 Cal.App.2d 190 [282 P.2d 190], is not in point. There there was considerable commingling of separate and admittedly community assets. The issue, as it is pertinent here, was to apportion a part of the increase in value of stocks to the separate property of the husband who died after his wife. The husband devoted his full time to market speculation, engaging in some 473 transactions in a 10-year period, and was an able and skilled trader. The investment had grown from $90,000 to several hundred thousand dollars (exact figure not given). The court said that the trial court's finding that none of the increase was due to the husband's efforts could not be sustained since the general rise in the market value of stocks during the period would not account for the gain especially in view of the husband's intensive trading activity. No such situation exists in the instant case.

Just how *Estate of Moore* (1923) 65 Cal.App. 29 [223 P. 73], cited by appellant, applies to our case does not appear. There the decedent so mingled the moneys received from her husband's estate with her other properties "that they cannot now be traced to their origin as a part of the community property." (P. 33.) The burden was on the appellants there to trace the moneys received by the decedent from the husband's estate into the present assets of the decedent. This the court held that they failed to do. Likewise, the other cases cited by appellant concerning tracing where there is a mingling of separate and community funds are not in point. In our case there was no mingling of separate and community assets. All of the husband's estate resulted from his original separate property. There was no reason to specifically trace each asset.

(c) *No agreement to change property status.*

The court found that there was no agreement, oral or written, before or during marriage, that the separate property of either spouse, or any part thereof, would be community property. The evidence fully supports this finding.

Appellant did testify that when they were married Ira told her "that if I would pay the taxes, insurance [on her home], buy my clothes and pay any doctor and dental bills, then the money that he made in the stock market would give us that much more money to travel on and that much more—if he passed away—before I did, or—yes—if he passed away before I did, I would have that much more money. . . ." " " 'Now, this is our property. What I make is yours, and what you make is mine. It's community property.' " Apparently the trial court did not believe these statements. This was its province. It observed appellant's demeanor on the stand and had the right to determine her credibility, particularly in view of her interest in the outcome of the case. Moreover, the conduct of the parties throughout the marriage belies this statement. Each spouse, except for a very small joint account for living expenses, scrupulously kept the earnings of his own property and his bank accounts separate from those of the other. Appellant knew that one of Ira's bank accounts was a joint one with his sister. Both parties kept their stocks registered in their own separate names. Appellant contends that the fact that in his will Ira made the bequest of $3,000 to her conditional that she take it "in lieu of any community property interest" indicates that he knew that his estate was community property. On the contrary, the small amount of the

bequest and the further statement in the will, "it being my intention that if she shall claim a community property interest in any or all the property in my estate, then this legacy to her shall fail . . ." raises the more logical inference that he thought some problems would arise in this regard and wished to protect what he considered his separate property. In any event, it negatives any understanding on his part that there had been any agreement such as claimed by appellant.

The finding that there was no agreement between the parties is amply supported.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.