[Sac. No. 7185. In Bank. May 22, 1962.]

Estate of CHARLES CHRISTIAN NEILSON, Deceased. HAZEL DeBOER et al., Claimants and Appellants, v. INES B. NEILSON, Claimant and Respondent.

Cleveland J. Stockton, William C. Coffill, Griffin, Conway & Jones and Jack R. Jones for Claimants and Appellants.

Robert R. Elledge and Charles M. Samson for Claimant and Respondent.

TRAYNOR, J.—Charles and Ethel Neilson were married in 1907. A son, Edwin Neilson, and a daughter, Mrs. Hazel DeBoer, are the sole issue of the marriage. Upon Ethel's death on May 1, 1939, the assets acquired during the marriage became the separate property of Charles.

On September 29, 1939, Charles married Ines Neilson. She owned no property at that time and acquired no separate property thereafter. Charles then owned three parcels of land, 24, 821 and 1,307 acres respectively, on which he raised grain. He paid for the 24-acre parcel before the marriage, but paid approximately $38,500 thereafter on the balance due for the other two parcels. During the marriage his income came almost exclusively from the sale of grain from these parcels and from numerous sales of unimproved realty.

Charles died testate on May 12, 1958. In his will he declared that "all of the property which I have is my own separate property and represents the accumulation of myself and my former wife, the mother of my two children." The

will disinherited Ines, devised certain real property to Wade Coffill in trust for Edwin, and left the residue of the estate to Hazel. After the will was admitted to probate, Ines elected to take half the community property existing at the time of Charles' death (Prob. Code, § 201.)

The executor initiated this heirship proceeding under Probate Code section 1080 to determine the rights of the various persons claiming an interest in the estate. The sole issue is how much, if any, of the decedent's estate was community property.

By stipulation of the parties the court submitted to the jury a special interrogatory as to the character of each of the 65 items of real and personal property in the inventory of the estate. Ines agreed that 16 items of personal property were decedent's separate property. The jury returned a special verdict that these and six other items of personal property were decedent's separate property and that the remainder of the personal property and all of the real property were community property, except the balance of the purchase price due on the 1951 sale of the 24-acre parcel, which was found to be half community property and half decedent's separate property. Among the items of personal property found to be community property is the balance due on three sales of unimproved realty.

The court entered a decree determining that Ines was entitled to half the property found to be community property, with interest thereon. Coffill, Edwin, and Hazel appeal. They contend that the trial court's refusal to give two instructions was prejudicial error, that the decree is not supported by substantial evidence, and that interest cannot be allowed in an heirship proceeding.

The first proposed instruction, based upon *Estate of Pepper*, 158 Cal. 619 [112 P. 62, 31 L.R.A. N.S. 1092], declared: "If the income and profits of separate property of a husband can be accurately identified and segregated, they would be his separate property and not community property. Thus, the income and earnings from the farming operations of a husband conducted by him upon his separate real property constitute his separate property, and are not community property even though he has devoted his personal industry, skill and attention to the cultivation and care of the farm property." The trial court refused to give this instruction on the ground that the rule of *Estate of Pepper* has been "practically wrecked" by subsequent cases.

In the *Pepper* case the estate consisted entirely of proceeds

from the sale of decedent's real property, which had been used for a nursery business, and the profits and earnings therefrom. Until he sold the land he devoted his time and energy to the nursery business. The court held that no apportionment of the nursery profits was required.

In reaching its decision that the entire estate was the decedent's separate property the court stated: *"The appellant does not dispute the proposition that, if Pepper had, year after year, sown his land to grain, the resulting crops would have formed a part of his separate estate.* But it is argued that, in the case of the nursery, the principal element in the success of the venture was the industry, skill, and attention of Pepper, and that the use of the land was merely incidental to what was, in effect, a commercial enterprise. We are unable to see that this argument furnishes a sufficient ground of distinction. In any agricultural enterprise, the labor and skill of man are essential to success. An orchard or a grain field must be cultivated and cared for. The resultant product is in part due to the processes of nature operating upon the land, and in part to the intelligent application of manual labor to the soil. It is, in the nature of things, impossible to apportion the crop so as to determine what share of it has come from the soil and what share from the exertions of man. The product must be treated as a whole, and, if it is the growth of land separately owned, it is the separate property of the owner of the land. . . . *If the crop of grain sown and harvested by the owner of the land constitutes 'issues and profits' of the land,* we are unable to see why the same may not be said of young trees and plants raised on the land until they are ready for transplanting." (158 Cal. at pp. 623-624.) (Italics added.)

It is apparent from the language italicized that one of the grounds of the court's holding was the wife's concession that the proceeds of a grain crop grown upon the realty of a husband would be his separate property, regardless of his efforts in raising the crop. The relevant statutes make no distinction between agricultural and other enterprises (Civ. Code, §§ 162, 163), and there were no reported cases that would warrant such a concession or that would support the proposition that profits are apportioned between the husband's separate property and the community property only when the enterprise is "commercial" rather than "agricultural."

In *Pereira* v. *Pereira,* 156 Cal. 1, 7 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880], decided one year before the *Pepper* case, this court first announced the rule that when a husband owns a business as his separate property and devotes his efforts to the enterprise, there must be an apportionment of the profits. ■ The usual method of apportionment is to allocate a fair return on the investment to the separate property and to allocate any excess to the community property as arising from the husband's efforts. (*Pereira* v. *Pereira, supra;* *Estate of Arstein,* 56 Cal.2d 239, 241 [14 Cal. Rptr. 809, 364 P.2d 33] ; *Randolph* v. *Randolph,* 118 Cal.App. 2d 584, 587 [258 P.2d 547] ; *Stice* v. *Stice,* 81 Cal.App.2d 792, 796 [185 P.2d 402].) "Only when the profits and accruals actually attributable to the separate property are proved to differ from [the usual interest rate for a well-secured investment] . . . is there reason to depart from this system." (*Randolph* v. *Randolph, supra.*) Departures from the *Pereira* formula have been made when the husband introduced evidence that "a larger return on his capital had in fact been realized." (*Gilmore* v. *Gilmore,* 45 Cal.2d 142, 150 [287 P.2d 769] [great increase in automobile business as a whole accompanied by increase in value of husband's dealer franchises; husband did not take active part in conducting routine operations of the business] ; *Harrold* v. *Harrold,* 43 Cal.2d 77, 80 [271 P.2d 489] [same] ; *Huber* v. *Huber,* 27 Cal.2d 784, 792 [167 P.2d 708] [custom broker business required considerable capital since money was advanced for customers] ; *Tassi* v. *Tassi,* 160 Cal.App.2d 680, 691 [325 P.2d 872] [high profits realized in meat business generally] ; *Logan* v. *Forster,* 114 Cal.App.2d 587, 601 [250 P.2d 730] [increase in population and economic development of community; wife played inactive role in conducting her business].)

■ An apportionment of profits is required not only when the husband conducts a commercial enterprise but also when he invests separate funds in real estate or securities. (*Margolis* v. *Margolis,* 115 Cal.App.2d 131, 135 [251 P.2d 396] ; *Witaschek* v. *Witaschek,* 56 Cal.App.2d 277, 280-281 [132 P.2d 600].) The proceeds and increment in value are apportioned entirely to the husband's separate estate only when they are attributable solely to the natural enhancement of the property (*Estate of Cudworth,* 133 Cal. 462, 468 [65 P. 1041] ; *McDuff* v. *McDuff,* 48 Cal.App. 175, 177 [191 P. 957]) or when the husband expended only minimal effort and the wife introduced no evidence attributing a value to his services.

(*Cozzi* v. *Cozzi*, 81 Cal.App.2d 229, 232 [183 P.2d 739];
*Estate of Barnes*, 128 Cal.App. 489, 492 [17 P.2d 1046].)

 There is no reason why a grain farmer or nursery
operator who conducts his enterprise on separate real prop-
erty should be exempted from the normal apportionment rule
and not be required to account to the community for a portion
of the profits. Accordingly, the *Pepper* case has been justly
criticized. (See 1 Armstrong, California Family Law 480;
4 Witkin, Summary of California Law [7th ed.] 2725]; Con-
tinuing Education of the Bar, Family Law for California
Lawyers, 368-369; Evans, *Primary Sources of Acquisition of
Community Property*, 10 Cal.L.Rev. 271, 284; *cf.* 14 Cal.L.
Rev. 402, 404-405.)

The *Pepper* holding was based not only on the erroneous
concession of counsel, but also on the ground that it is "im-
possible to apportion the crop so as to determine what share
of it has come from the soil and what share from the exertions
of man." (158 Cal. at p. 624.) Although it may be difficult
to make an apportionment, it is "impossible" only in the
sense that it cannot be mathematically certain. (See *Jenkins*
v. *Jenkins*, 110 Cal.App.2d 663, 666 [243 P.2d 79], where
5/14 of 28 head of cattle bought with the husband's separate
property were apportioned to the community.) The long
line of cases starting with *Pereira* dispels any notion that
such impossibility justifies a finding that none of the proceeds
belongs to the community. These cases have established the
rule that when part of the proceeds from a separate property
enterprise or investment arise from the husband's efforts,
there must be an apportionment. *Estate of Pepper, supra,*
158 Cal. 619, is therefore overruled. The first proposed
instruction was properly refused, for it erroneously declared
that even though a husband devoted his efforts to farming
operations all of the income and earnings therefrom would
be his separate property.

 The second proposed instruction declared: "Evi-
dence that there was no excess of community income over
community expenses is as effective to prove that all assets in
the name of a decedent are separate property as a specific
showing from which separate source each asset flowed." The
proposed instruction is based upon a statement in *Estate of
Ades*, 81 Cal.App.2d 334, 339 [184 P.2d 1], which was quoted
with approval in *Estate of Arstein*, 56 Cal.2d 239, 242 [14
Cal.Rptr. 809, 364 P.2d 33]. This statement was properly
invoked in those cases, for transmutation of separate property

into community property by agreement was not in issue. An instruction based on that statement would be erroneously incomplete, however, when, as in the present case, such transmutation is in issue.

It is presumed that the expenses of the family are paid from community rather than separate funds. (*Huber* v. *Huber,* 27 Cal.2d 784, 792 [167 P.2d 708].) Thus, in the absence of any evidence showing a different practice the community earnings are chargeable with these expenses. (*Title Ins. & Trust Co.* v. *Ingersoll,* 158 Cal. 474, 492 [111 P. 360].)

When a husband devotes his services to and invests his separate property in an economic enterprise, the part of the profits or increment in value attributable to the husband's services must be apportioned to the community. If the amount apportioned to the community is less than the amount expended for family purposes and if the presumption that family expenses are paid from community funds applies, all assets traceable to the investment are deemed to be the husband's separate property. (*Estate of Ades, supra,* 81 Cal.App.2d at p. 338; *Estate of Arstein, supra,* 56 Cal.2d at p. 241; *Logan* v. *Forster,* 114 Cal.App.2d 587, 601-602 [250 P.2d 730]; *Cozzi* v. *Cozzi,* 81 Cal.App.2d 229, 232-233 [183 P.2d 739].) Similarly, when a husband purchases property during the marriage with funds of an undisclosed or disputed source, the presumption that the property is community may be overcome by evidence that community expenses exceeded the community income. In such a case, the husband traces the source of the disputed property to his separate property by a process of elimination: since all the community income was exhausted by family expenses the property must have been purchased with his separate funds. (*Kenney* v. *Kenney,* 128 Cal.App.2d 128, 136 [274 P.2d 951]; *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116, 126-127 [264 P.2d 626].)

In either of these two types of cases, the instruction proposed by appellants would accurately state the law only if the wife did not introduce evidence that the husband's separate property was transmuted into community property. If the jury found that there was such an agreement, an excess of community expenses over community income could not prove that assets in the husband's name were his separate property. Thus, within the context of this case, the proposed instruction was inaccurate and was properly refused. More-

over, the jury was correctly informed of the nature and effect of the presumption in another instruction[1] given to the jury.

Appellants' basic contention is that there is no substantial evidence to support the special verdict. ▉▉▉ Since neither Ines nor any other witness testified that there was a written or oral agreement changing the character of her husband's separate property (see *Woods* v. *Security-First Nat. Bank,* 46 Cal.2d 697, 701 [299 P.2d 657]; *Kenney* v. *Kenney,* 220 Cal. 134, 136 [30 P.2d 398]), she is compelled to rely upon the rule first stated in *Title Insurance & Trust Co.* v. *Ingersoll,* 153 Cal. 1, 5 [94 P. 94]: "it is not essential in such a case for the husband to show any express agreement on the part of the wife. The gift or change in the *status* of the property may be shown by the very nature of the transaction or appear from the surrounding circumstances." (See also *Long* v. *Long,* 88 Cal.App.2d 544, 549 [199 P.2d 47].)

Although there is substantial evidence in the record that would support a finding of transmutation, it is apparent from the special verdict that the jury based its verdict not on transmutation, but on a faulty understanding of the instructions relating to commingling of community and separate property.

The jury found the 1,307 and 821-acre parcels and all assets traceable to them to be community property. Payments on the purchase price of each of these parcels were made before and after Charles' marriage to Ines and many improvements were made thereon after the marriage. The jury, however, found the purchase price due Charles on the 1951 sale of the 24-acre parcel to be half separate and half community property. Although improvements were also made on this parcel after the marriage, Charles had paid the entire purchase price for it before the marriage. Since there is no evidence that there was a transmutation of the first two parcels but not of the third, the jury must have interpreted the instructions to mean that land is entirely community if community funds are used to pay a part of the purchase price regardless of the fact that substantial separate property funds were also

---

[1] "It is presumed that all living expenses during marriage are paid from community income, if any exists. If you find that any of the income received from any source either by Charles Christian Neilson or by Ines Neilson during their marriage was community property and that all living expenses were paid from community funds, then you must subtract from such community income all family living expenses of the Neilson family during the marriage, and only the balance remaining, if any, would have the status of community property."

744

used. ■ Such an interpretation is erroneous, for "the rule developed through the decisions in California gives to the community a *pro tanto* community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds." (*Forbes* v. *Forbes,* 118 Cal.App.2d 324, 325 [257 P.2d 721]; *Garten* v. *Garten,* 140 Cal.App.2d 489, 494 [295 P.2d 23]; *Estate of Fellows,* 106 Cal.App. 681, 683 [289 P. 887].) In such cases, the property cannot be considered entirely community by virtue of commingling of separate and community assets, for the separate and community sources of the property can be traced. (*Fountain* v. *Maxim,* 210 Cal. 48, 51 [290 P. 576]; *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116, 124 [264 P.2d 626].) Upon the evidence before it, the jury had no choice but to find that all three parcels of land had or had not been transmuted to community property, and if not to apportion the property according to the extent that separate and community funds contributed to the various purchase prices and improvements.

Because of this inconsistency in the jury's verdict the decree must be reversed. To aid the trial court on the retrial of this case, however, we shall consider the evidence that Ines contends would support an inference that there was an agreement of transmutation and also appellants' contention that interest cannot be awarded in an heirship proceeding. (Code Civ. Proc., § 53.)

Ines testified that Charles filed joint income tax returns each year of their marriage except 1946 when individual returns were filed. The 1946 returns also split the total income of both spouses. ■ The fact that a husband and wife filed tax returns splitting their income before 1948[2] is substantial evidence that will support a finding of transmutation. (*Heck* v. *Heck,* 63 Cal.App.2d 470, 475 [147 P.2d 110];

[2]Joint returns filed in 1948 and subsequent years are no evidence of transmutation. Since that year husbands and wives in all states have been permitted to file joint returns and split their income whether the income reported is separate or community. (Revenue Act of 1948, §§ 301, 303, 62 Stat. 114, 115, 26 U.S.C.A. §§ 2, 6013; see also *Hofferbert* v. *Marshall* (4 Cir. 1952) 200 F.2d 648, 650-651.) Before 1948, spouses living in community property states could split their community income if the wife had a present, existing, and equal interest in the community property. (*Poe* v. *Seaborn,* 282 U.S. 101, 111 [51 S.Ct. 58, 75 L.Ed. 239]; *Goodell* v. *Koch,* 282 U.S. 118 [51 S.Ct. 62, 75 L.Ed. 247]; *Hopkins* v. *Bacon,* 282 U.S. 122 [51 S.Ct. 62, 75 L.Ed. 249]; *Bender* v. *Pfaff,* 282 U.S. 127 [51 S.Ct. 64, 75 L.Ed. 252]; *United States* v. *Malcolm,* 282 U.S. 792 [51 S.Ct. 184, 75 L.Ed. 714].)

*Estate of Raphael,* 91 Cal.App.2d 931, 939 [206 P.2d 391]; see also *Lawatch* v. *Lawatch,* 161 Cal.App.2d 780, 790 [327 P.2d 603]; *Estate of Cummins,* 130 Cal.App.2d 821, 829 [280 P.2d 128]; *Handley* v. *Handley,* 113 Cal.App.2d 280, 284 [248 P.2d 59].) The filing of such returns, however, does not establish transmutation as a matter of law. (*Barker* v. *Barker,* 139 Cal.App.2d 206, 212-213 [293 P.2d 85]; *Kenney* v. *Kenney,* 128 Cal.App.2d 128, 135 [274 P.2d 951].)

It is presumed that a person obeys the law. (Code Civ. Proc., § 1963, subd. 33; *Groves* v. *City of Los Angeles,* 40 Cal.2d 751, 757 [256 P.2d 309]; *Gould* v. *Stafford,* 91 Cal. 146, 153 [27 P. 543].) Charles and Ines could split their income for tax purposes prior to 1948 only if it was community income or each owned half the property. Their returns were signed under the penalty of perjury and created a disputable presumption that Charles had filed lawful income returns and that his separate property had therefore been transmuted into community property. (See *Harlow* v. *United Title Guaranty Co.,* 145 Cal.App.2d 672, 675 [303 P.2d 16].)

This presumption can be overcome by evidence that the income splitting represented nothing more than an "overzealous desire to minimize income taxes." (See Marsh, *California Family Law—A Review,* 42 Cal. L. Rev. 368, 373.) Such evidence might consist of testimony that the returns were prepared by or upon the advice of a tax expert and the spouses did not understand the significance of reporting income in this manner (*Hopkins* v. *Detrick,* 97 Cal.App.2d 50, 56 [217 P.2d 78]; *Balkema* v. *Deiches,* 90 Cal.App.2d 427, 430-431 [202 P.2d 1068]), or of testimony or documents indicating that the spouses regarded the property as separate property despite the filing of income-splitting returns.

In three sales of property that Charles owned at the time of the marriage, the deeds contained Charles' and Ines' signatures and the granting clauses stated that both were the grantors. Two of these deeds were executed in 1955, the other in 1956. The granting clauses of at least four other deeds executed between 1946 and 1956, however, described Charles as "dealing with his sole and separate property," and as the grantor. Moreover, an officer of the title insurance company, upon whose forms the deeds containing Ines' name and signature were executed, testified that it was the policy of his company and the lending institution that financed the transactions to require a wife to join in the execution of a deed even when title to the property is vested in her husband. He

testified further that the policy of his company did not purport to reflect the character of the property being conveyed.

Ines also executed five joint and several notes with her husband. All of these notes were executed within a five-month period in 1956. The officer of the bank who negotiated these loans testified that he had Ines sign the notes because "in 1956 I noticed that Mr. Nielson's health was failing and so I figured the bank would be in a better position to have both parties on the Note in case something should happen to Mr. Nielson." This testimony also explains the addition of Ines' name to Charles' open-note account with the bank in 1956.

Under these circumstances, the fact that Ines joined in the execution of three deeds and five notes, taken alone, would not be sufficient to sustain a finding of transmutation. (See *Wedemeyer* v. *Elmer*, 33 Cal.App.2d 336, 339 [91 P.2d 642] ; *Martin* v. *Martin*, 52 Cal. 235, 237 ; *Oldershaw* v. *Matteson & Williamson Mfg. Co.*, 19 Cal.App. 179, 183 [125 P. 263] ; *Diefendorff* v. *Hopkins*, 95 Cal. 343, 351 [28 P. 265, 30 P. 549] ; *Kenney* v. *Kenney*, 128 Cal.App.2d 128, 138 [274 P.2d 951].) The jury could, however, consider these documents as evidence supporting the presumption that by filing the income-splitting tax returns Charles had converted his separate property into community property.

Ines testified that when she signed the first joint note the bank officer said in substance "that it was our property, and —our community property, and he would like my signature, with my husband's on the note." She also testified that Charles was present at the time and said nothing to the contrary. The bank officer testified that he could not remember making such a statement and that he requested Ines' signature on the note because of Charles' failing health.

When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. (*Code Civ. Proc.*, § 1870, subd. 3 ; *Adkins* v. *Brett*, 184 Cal. 252, 255 [193 P. 251] ; *People* v. *Simmons*, 28 Cal.2d 699, 712-713 [172 P.2d 18].) His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence. (*Estate of Snowball*, 157 Cal. 301, 311 [107 P. 598] ; *Tibbet* v. *Sue*, 125 Cal. 544, 546 [58 P. 160].) Although Charles was not a party to this action, any admissions he may have made with regard to the character of the property would be binding upon appel-

lants as his successors in interest. (Code Civ. Proc., § 1870, subd. 4; *Estate of Hill,* 167 Cal. 59, 65 [138 P. 690]; *Ingersoll* v. *Truebody,* 40 Cal. 603, 613.) Admissibility of this evidence depends upon whether the bank officer made the alleged statement under circumstances that called for a reply, whether Charles understood the statement, and whether it could be inferred from his conduct that he adopted the statement as an admission. (*People* v. *Purvis,* 56 Cal.2d 93, 97 [13 Cal.Rptr. 801, 362 P.2d 713]; *People* v. *Simmons, supra; Southers* v. *Savage,* 191 Cal.App.2d 100, 104-105 [12 Cal.Rptr. 470.) The bank officer did not make the alleged statement under circumstances that would ordinarily evoke a response. This is not a case where a person was silent in the face of an accusation of a crime, negligence, or other wrongdoing. (See *Keller* v. *Key System Transit Lines,* 129 Cal.App.2d 593, 596 [277 P.2d 869].) The alleged remark, made privately to Charles and Ines by a person who apparently had no particular familiarity with the character of their property, was at most a vague and inconclusive assertion that some unidentified items were community property. (Compare the explicit statement made in the husband's presence by his attorney in *Lawatch* v. *Lawatch,* 161 Cal.App.2d 780, 790 [327 P.2d 603].) Under these circumstances, Charles' silence cannot be interpreted as an adoptive admission. (*Perkins* v. *West,* 122 Cal.App.2d 585, 591 [265 P.2d 538]; *Henderson* v. *Northham,* 176 Cal. 493, 497 [168 P. 1044]; *Wilkins* v. *Stidger,* 22 Cal. 231, 239 [83 Am. Dec. 64].)

We agree with appellants that the trial court erred in awarding interest to Ines. Probate Code section 1233 provides: "Except as otherwise provided by this code or by rules adopted by the Judicial Council, the provisions of Part 2 of the Code of Civil Procedure are applicable to and constitute the rules of practice in the proceedings mentioned in this code with regard to trials, new trials, appeals, and all other matters of procedure." Thus, Code of Civil Procedure section 581, providing when an action may be dismissed (*O'Day* v. *Superior Court,* 18 Cal.2d 540, 542-543 [116 P.2d 621]), section 583, providing for dismissal for want of prosecution (*Estate of Morrison,* 125 Cal.App. 504, 509 [14 P.2d 102]), and section 387, providing for intervention by interested persons (*Voyce* v. *Superior Court,* 20 Cal.2d 479, 485 [127 P.2d 536]) apply to proceedings in probate. Not all of the provisions of part 2 of the Code of Civil Procedure apply to probate proceedings, however. Such proceedings are to

conform only *"as nearly as is consistently possible,* to those for civil actions." (*O'Day* v. *Superior Court, supra,* 18 Cal.2d at p. 543.) (Italics added.) (See also *Horney* v. *Superior Court,* 83 Cal.App.2d 262, 267 [188 P.2d 552].)

Code of Civil Procedure section 1033 provides in part that "[t]he clerk or judge must include in the judgment entered up by him, any interest on the verdict or decision of the court, from the time it was rendered or made, and the costs, if the same have been taxed or ascertained." Ines contends that this section is incorporated into the Probate Code through section 1233 of that code and applies to heirship decrees. ▮ Probate Code section 1232, however, authorizes an award of costs in heirship proceedings, but neither that nor any other section of the Probate Code specifically authorizes an interest award in such proceedings. The fact that provision is made for costs but not for interest indicates that interest is not to be awarded. Moreover, Code of Civil Procedure section 1033 is included in part 2, title 14, chapter 6, which deals almost exclusively with the awarding of costs in civil actions. Had the Legislature meant to authorize interest awards in heirship proceedings it would have specifically so provided in the Probate Code as it did for costs or would have made no provision for costs in that code. ▮ Furthermore, an heirship proceeding is not an ordinary civil action, but a specialized proceeding in rem. (*Estate of Wise,* 34 Cal.2d 376, 383 [210 P.2d 497].) ▮ The sole purpose of such a proceeding is to "determine who are the heirs of the decedent or entitled to distribution of the estate and [to] . . . specify their interests." (Prob. Code, § 1081.) ▮ The decree is not in favor of one of the parties against another. (*Estate of Wise, supra,* 34 Cal.2d at p. 385 ; *Estate of Radovich,* 48 Cal.2d 116, 120 [308 P.2d 14].) ▮ As was stated in *Whalen* v. *Smith,* 163 Cal. 360, 364 [124 P. 904, Ann. Cas. 1913E 1319] : "This section [predecessor of Prob. Code, §§ 1080-1082] provides a special proceeding for the purpose of ascertaining and determining, in advance of distribution, the persons who have succeeded to the estate and the portions inherited by or devised to each of them. . . . No other judgment is to be rendered and no disposition whatever is to be made of the estate. It is a determination, first, of the persons entitled as heirs, devisees, or legatees, or as their successors, if any have died; and, second, the interest of each one in the estate of the decedent." ▮ In view of the limited purpose of an heirship proceeding and the fact that interest

is ordinarily awarded only on a money judgment (*Sullivan v. Wellborn*, 32 Cal.2d 214, 219 [195 P.2d 787]) the court erroneously awarded Ines interest on half the property found to be community property.

The decree is reversed.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Respondent's petition for a rehearing was denied June 20, 1962.