[Civ. No. 23566. First Dist., Div. Three. Nov. 24, 1967.]

Estate of DOMENICO CASELLA, Deceased. MARY CASELLA, Plaintiff and Appellant, v. MICHAEL CASELLA et al., Objectors and Appellants.

Watson, Tedesco & Sanguinetti and William G. Filice for Objectors and Appellants.

Weir, Hopkins, Jordan & Mitchell, Weir, Hopkins, Donovan, Jordan & Mitchell and Robert C. Donovan for Plaintiff and Appellant.

BRAY, J.*—This is an appeal by Paul Casella and Michael Casella, brothers of Domenico Casella, deceased, from certain portions of the judgment herein, and appeal by Mary Casella, widow of said deceased, from certain other portions of the judgment. As the parties are both petitioners and appellants, Paul and Michael will be referred to as the ''Brothers'' and the widow will be referred to as Mary.

### Questions Presented

1. Did the probate court have jurisdiction to determine the ownership of joint tenancy properties?

2. Were the joint tenancies between Domenico and Mary destroyed?

3. Was the effect of the will's *in terrorem* clause before the court?

### Record

Domenico Casella died April 11, 1964. The Brothers obtained admission of his will to probate and letters testamentary were issued to them. Mary filed in the estate ''Petition for Decree Determining Interest in Estate.'' The Brothers filed ''Petition for Determination of Entitlement to Distribution of Estate.'' Also Mary and the Brothers filed ''Statements of Interest.''

After a hearing the court found that all of the property of Domenico was originally his separate property; that certain of the properties became joint tenancy properties and that a certain quitclaim deed obtained by Domenico from Mary was obtained in violation of the confidential relationship between them. The court proceeded to make disposition of the properties as hereinafter set forth. The appeals followed.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

## The Testimony

In 1929 Domenico and the Brothers became partners in a grocery business which they operated until 1945 when it was sold. During the 15-year period of the business, the partners worked 12 to 15 hours per day with no vacations. The partners withdrew an equal share of the income of the business and equally divided the proceeds of the sale of the business.

On December 11, 1932, approximately three years after the start of the grocery business, Domenico and Mary were married and lived together until his death, over 31 years later. There were no children of the marriage. Apparently Domenico had the old country idea that he should manage all the business affairs of the spouses, pay the bills and keep his wife in complete ignorance thereof and of the property accumulated. He took care of everything. She signed any paper he presented to her for signature without knowing its contents.

After sale of the grocery business Domenico retired, continuing, however, to manage the properties he had acquired before and after marriage. In 1950 he reopened the grocery store for a brief period. The venture was not successful and the business went broke. The properties listed in the inventory in the estate will be hereinafter discussed. The will dated October 7, 1963, approximately six months before Domenico's death, left all of his property to his brothers, with the exception of personal effects and a $10,000 cash trust, payable $50 per month to Mary. Domenico apparently had discovered a note written to Mary by her brother advising her to leave $10,000 to Domenico out of her separate estate. Mary told Domenico she would leave him $10,000, and he then said that he would leave her a like sum.

The inventory and appraisement filed in the estate showed the following items of property, valued at the following amounts:

| Item No. | Description | Amount |
|---|---|---|
| 1. | 1961 Ford Automobile (proceeds) | $ 1,000.00 |
| 2. | Promissory note and deed of trust dated January 1, 1963 — Alvarez to Casella—original balance $27,500 from sale of Lot 4 | 24,259.40 |
| 3. | Promissory note dated August 14, 1958 —Phillips to Casella—original note $10,500.00—from sale of Lot 35 | 8,358.67 |

| | | |
|---|---|---:|
| 4. | Promissory note and deed of trust dated March 10, 1964, Alvarez to Casella—from sale of Lots 2, 3 and 7 | 80,000.00 |
| 5. | Savings account — Pioneer Investors Willow Glen Branch | 1,818.90 |
| 6. | Real property (family residence) located at 1588 Willow Oaks Street, San Jose, California | 30,000.00 |

Item 1 is the only property which is not in issue on this appeal. (The court held that it was Mary's separate property.) We will discuss separately the disputed items of property.

Item 2. The $27,500 note Alvarez to Domenico.

The source of this note was a sale of Lot 4, Wright's Subdivision, Sunol Addition, San Jose on January 1, 1963 to Mr. and Mrs. Joe Alvarez. The lot was owned by Domenico at the time of his marriage. The note and deed of trust resulting from the sale of the lot was found by the court to be Domenico's separate property. Mary contends that this property was transmuted from Domenico's separate property to community property by reason of the fact that Domenico and Mary in 1947 filed separate income tax returns in which these items were reported as community property. This contention is hereinafter discussed, and we hold that this one act of the parties did not transmute the status of the property into community property.

Item 3. $10,500 note Phillips to Domenico.

In 1926, prior to the marriage, Domenico acquired Lot 35, Columbia Avenue. It was the family residence from 1932 until 1956. In 1958 by deed executed by both spouses, the property was conveyed to Phillips, who executed a promissory note to Domenico and Mary as joint tenants. On April 4, 1963, Mary assigned to Domenico said note as his separate property. The trial court declared this assignment void and set it aside as being obtained by violating the husband and wife confidential relationship while Mary was under the undue influence of Domenico.[1] The court held that the note remained in joint tenancy and that Mary, as surviving tenant, is entitled to it. As hereinafter set forth, the court's holding was proper.

---

[1] As this determination of the court is not attacked in any way, we will not discuss the evidence supporting the court's action concerning it, or the court's setting aside of the quitclaim deed Mary to Domenico, hereinafter mentioned for the same reason.

Item 4. Promissory Note and Deed of Trust, Alvarez to Domenico for $80,000.

The court found that these comprised the sale prices of three lots sold by Domenico to Joe R. and Mary Alvarez which were as follows:

Lot 2 sale price $30,050
3 sale price $30,050
7 sale price $19,900

The note and deed of trust given by the Alvarezs for the purchase price were executed to Domenico, ''a married man, as his separate property.''

Lot 2. The court found that Lot 2 was Domenico's separate property and hence that portion of the note and deed of trust resulting from its sale was likewise his separate property. This lot had been purchased in 1943 by Domenico from the proceeds of a sale of Paula Street property which Domenico had acquired in 1925. Title was vested in Domenico by the deed. In 1964 Domenico sold Lot 2, together with Lots 3 and 7, to the Alvarezs. The grantor clauses in all three deeds read ''Domenico Casella, who acquired title as a married man, as his separate property hereby grants. . . .'' The Alvarezs executed for the three lots a promissory note and deed of trust for $80,000 to ''Domenico Casella, a married man, as his separate property.'' In 1946 and 1947 Lot 2 was rental property. Domenico kept the property in repair and had put on a new roof. The trial court found that 30,050/80,000 of the amount of the note was the price received by Domenico for the sale of Lot 2; that the lot was Domenico's separate property and, therefore, that portion of the note and deed of trust representing its sale price was his separate property. Mary claims that by the 1947 income tax return Lot 2 had been transmuted into community property. As hereinafter set forth, we hold that the return did not have such effect.

Lots 3 and 7. Domenico and Mary acquired, as joint tenants, Lot 3 on November 6, 1957, and Lot 7 on July 26, 1957. These lots, as before stated, were sold to Alvarez and the purchase moneys were included in the $80,000 note. The court found that 49,950/80,000 of the note was attributable to the sale of these two lots. On April 3, 1963, Domenico obtained from Mary a quitclaim deed quitclaiming any interest in these two lots and in the family home hereinafter mentioned. The court found that this deed was obtained in violation of the husband and wife's confidential relationship and by reason of Domenico's undue influence and set the deed aside. The effect

of setting aside that deed will hereinafter be discussed. The court found that at the time of the sale to Alvarez Lots 3 and 7 were held in joint tenancy and that the moneys from the sale, $49,950, also were held in joint tenancy, and that Mary is entitled to them as surviving joint tenant.

Item 5. Savings Account—$1,818.90.

The record title to this account at Domenico's death was in joint tenancy. The court found this account to be the deceased's separate property. There was no evidence as to the source of the moneys that made up this account. The Brothers contend that Domenico received payments on various notes which the court found to be his separate property and that it must be assumed that these payments went into the account. Assuming this to be true, there is still no evidence to overcome the presumption that the account was what it purported to be, held in joint tenancy. See *Cordasco* v. *Scalero* (1962) 203 Cal.App.2d 95, 105 [21 Cal.Rptr. 339], where the court states: "[T]he general rule that where community personal property or any other personal property, no matter what its original form might have been, has been changed by the parties to joint ownership during the joint lives of the owners, the funds so changed to joint tenancy, or any property acquired from the funds held in joint tenancy, will remain joint tenancy in character, unless there has been a change in the character of the property by some agreement between the parties." *Benam* v. *Benam* (1960) 178 Cal.App.2d 837, 844 [3 Cal.Rptr. 410], quoting from *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 212 [259 P.2d 656], states: "'[T]he presumption arising from the form of the deed may not be rebutted solely by evidence as to the source of the funds used to purchase the property. . . .'" No agreement for change of the patent status of this account appears in the evidence.

Item 6. Family Residence, Willow Oaks Street, San Jose.

Domenico and Mary acquired this property as joint tenants on January 30, 1956. This property was included in the quitclaim deed which the court held null and void. The court quieted title in Mary as surviving joint tenant. As hereinafter appears in the discussion concerning Lots 3 and 7, the setting aside of the quitclaim deed restored the title to the properties as it was prior to the execution of that deed—namely to joint tenancy. Therefore, the title to the family residence was in joint tenancy at Domenico's death, and the court properly quieted the title in Mary as surviving tenant.

## 1. Jurisdiction.

█ The pleadings before the probate court consisted of the petitions to determine heirship; that of the Brothers and that of Mary. The Brothers in their petition alleged that all of the property of the estate was the separate property of Domenico. Mary alleged that all of the property was community property and that the quitclaim deed hereinbefore mentioned was fraudulently obtained. Later she contended that she was entitled as surviving tenant to the property which was in joint tenancy.

The Brothers contend that the court had no jurisdiction to do other than determine whether the properties of the estate were either community or separate property and had no right to vest the joint tenancy property in Mary as surviving tenant.

In *Estate of Baglione* (1966) 65 Cal.2d 192 [53 Cal.Rptr. 139, 417 P.2d 683], the widow of the decedent filed a petition to determine heirship in the probate court. She contended that because of an alleged oral contract between her and the decedent in which it was agreed that the survivor would succeed to all property acquired by the spouses during the marriage, she was entitled to the entire property of the estate which the court found was community property. The probate court refused, as being beyond its jurisdiction, to consider the alleged contract. In holding that the probate court did have jurisdiction to consider the alleged agreement, the Supreme Court stated: "As a general rule the jurisdiction of superior courts sitting in probate to administer decedents' estates does not encompass power to pass upon assertions of title to property by parties who are not in privity with the estate but are claiming adversely to it. [Citations.] There are, however, several well-recognized exceptions to this rule 'where a controversy has been held to have a sufficient connection with a pending probate proceeding to be properly litigated therein. . . .' (*Central Bank* v. *Superior Court,* 45 Cal.2d 10, 15 [285 P.2d 906].) The connection may arise out of the relationship between the parties. Thus the superior court sitting in probate can adjudicate a claim to assets from the estate asserted by an executor or administrator in his individual capacity [citations], and it can determine whether an assignment or other transfer of the interest of an heir, legatee, or devisee to a third party is valid and order distribution accordingly. [Citations.] The connection may also arise out of the nature of the claim to the property. The superior court sitting in probate can

determine the claim of a surviving wife to her share of the community property [citations] or adjudicate a dispute between claimants to property 'conceded . . . to be or to have been acquired . . . in the course of probate proceedings.' [Citations.] In *Woods* v. *Security-First Nat. Bank,* 46 Cal.2d 697 [299 P.2d 657], we recognized a third type of exception based on the nature of the claim and the claimant's relationship to the estate. When a party invokes the jurisdiction of a court sitting in probate by asserting a substantive right in a particular piece of property or in certain assets as an heir, legatee, or devisee, he may also obtain a judgment in that court determining any additional claims that he asserts against those in privity with the estate in the same property. [Citations.] The rationale for this exception is the conservation of time, energy, and money of all concerned. To deny a superior court sitting in probate the power to determine the whole controversy between the parties before it is pointless. In the exercise of its legal and equitable powers [citations], a superior court sitting in probate that has jurisdiction over one aspect of a claim to certain property can determine all aspects of the claim. A claimant is not required to sever and litigate a multifaceted claim in separate proceedings once all the necessary parties are before the court. Thus in the instant case, once the court determined that Marie had a community interest in the Lake Tahoe property subject to probate, it should have resolved the entire controversy and determined her rights to that property under the alleged oral agreement with the deceased. Any statements in *Sieroty* v. *Silver,* 58 Cal.2d 799 [26 Cal.Rptr. 635, 376 P.2d 563], and *Smith* v. *Smith,* 220 Cal.App.2d 30 [33 Cal.Rptr. 559] to the contrary are disapproved." (At pp. 196-197.)

In *Merola* v. *Superior Court* (1954) 125 Cal.App.2d 1 [269 P.2d 664], it was held that the probate court did not have jurisdiction to consider the claim of the widow to joint tenancy property as she was claiming adversely to the estate and not in privity to it. However, this was prior to *Estate of Baglione, supra,* which definitely holds that for the probate court to have jurisdiction the claimant need not necessarily be in privity with the estate. *Baglione* expressly overruled *Sieroty* v. *Silver* (1962) 58 Cal.2d 799 [26 Cal.Rptr. 635, 376 P.2d 563], where, in an action between the executors of an estate and decedent's widow to obtain proceeds of life insurance policies, the court held that the probate court did not have jurisdiction of the widow's claim because her claim was not

in privity with the estate, and *Smith* v. *Smith* (1963) 220 Cal.App.2d 30 [33 Cal.Rptr. 559], where, in an action for declaratory relief, the court held that in heirship proceedings in the probate court, the court could not consider the appellant's claims under an oral agreement with the decedent as he was not in privity with the estate.

It is clear that *Baglione* has changed the rule requiring privity with the estate to exist in order to give the court jurisdiction to try the claims of a surviving spouse to property of a decedent. In an excellent discussion *An Extension of Probate Jurisdiction* (1967) 7 Santa Clara Lawyer, page 275, the writer points out that in addition to the "privity" exceptions to the general rule, "the probate court, by reason of *Baglione,* has power to determine a stranger's claim to property if such determination is necessary and proper to a complete judgment, but only if the stranger's claim and relationship bear a particular relation to the estate." We hold that such a situation exists in the case at bench and that the probate court had jurisdiction to consider Mary's claims to the joint tenancy property.

2. The Joint Tenancies Were Not Destroyed.

As we have hereinbefore set forth, joint tenancies were created in the following properties: Item 3—the Phillips promissory note and deed of trust, Item 4—Lots 3 and 7, portions of the $80,000 note and deed of trust, Item 6—the Willow Oaks family home.

■ The Brothers contend that these joint tenancies were transmuted into separate property by (a) the quitclaim deed and assignment by Mary to Domenico, even though they were declared null and void by the court, and (b) the deeds executed by Domenico to the Alvarezs.

(a) The Brothers contend that the execution by Mary of the quitclaim deed, even though void, destroyed the unities necessary to sustain a joint tenancy and caused the property to be held thereafter in tenancy in common. ■ It is true, as contended by the Brothers, that the absence of the unities will change the nature of a joint tenancy estate (*Hammond* v. *McArthur* (1947) 30 Cal.2d 512, 514 [183 P.2d 1]), also, that a joint tenancy is terminated when one joint tenant conveys his entire interest to the other joint tenant. (*Estate of Harris* (1937) 9 Cal.2d 649 [72 P.2d 873].) Moreover, the voluntary conveyance by one joint tenant to a third person will break the joint tenancy even though the other joint tenant had no

knowledge of the transaction. (*Palmer* v. *Palmer* (1942) 49 Cal.App.2d 331 [121 P.2d 822].) However, we have been cited to no authority, nor do we find one, holding that where one of the joint tenants has been induced fraudulently to convey his interest in the joint tenancy to his co-joint tenant, such act destroys the joint tenancy unities. The Brothers, because the deed was a voidable one (see *Hicks* v. *Hicks* (1962) 211 Cal.App.2d 144, 156 [27 Cal.Rptr. 307]), seem to be confused with the results of the execution of the deed as between the maker of the deed and the innocent purchaser and its execution as to the other tenant who committed the fraud. When the court set the deed aside, the joint tenancy relationship between the parties was restored, or rather, it was as though no deed had ever been executed. (See *Gillette* v. *Nicolls* (1953) 121 Cal.App.2d 185, 190 [262 P.2d 856].) As said in *Reina* v. *Erassarret* (1949) 90 Cal.App.2d 418, 422 [203 P.2d 72, 7 A.L.R.2d 1309], title rests in the joint tenants at the time of the original grant. The status of the title remained as it was before the execution of the deed—joint tenancy.

 (b) The Brothers contend that if the voidable quitclaim deed did not sever the joint tenancy, the conveyance from Domenico to Alvarez did. It is conceded that as the Alvarezs were purchasers for value without notice of the invalidity of the quitclaim deed, title was conveyed to them, and hence, it is the portion of the $80,000 given in payment of Lots 3 and 7 which is the subject of our determination. Where a tenant sells only his joint tenancy interest, the joint tenancy is terminated. (*Delanoy* v. *Delanoy* (1932) 216 Cal. 23 [13 P.2d 513]; *Estate of Harris* (1937) 9 Cal.2d 649 [72 P.2d 873].) However, in this case it was not Domenico's intention to dispose *only* of his interest in the property. He did not intend by the sale to sever the tenancies. He intended by obtaining the fraudulent deed to get for himself as his separate property the entire purchase prices. As the law, in effect, creates as between Mary and the bona fide purchasers a consent by her to the sale, the purchase prices must be regarded as if received in a sale in which the joint tenants conveyed together. To hold that by this sale the joint tenancy relationship as to the purchase money was destroyed would be to give Domenico a premium on his fraud.

 Where a joint tenant gives a joint tenancy property in exchange for personal property, that property retains its joint tenancy characteristics. (*Estate of Harris* (1915) 169

Cal. 725, 726 [147 P. 967] ; *Fish* v. *Security-First Nat. Bank* (1948) 31 Cal.2d 378 [189 P.2d 10] ; *Estate of Zaring* (1949) 93 Cal.App.2d 577 [209 P.2d 642].) (See generally 13 Cal. Jur.2d, Cotenancy, § 6.) *Estate of Zaring, supra,* is closest to the instant case. In *Zaring* it was held that proceeds received when a parcel of joint tenancy real estate was condemned retained its character as joint tenancy property. In *Zaring* the applicable rule was stated to be : ''And the proceeds of joint tenancy property, in the absence of contrary agreement, retain the character of the property from which they were acquired.'' (At p. 580.) ■ There was no evidence in this case of an agreement between the parties that the proceeds of the sale of Lots 3 and 7 were to be held in any relationship other than that of the real title to the properties—joint tenancies.

The court properly held that Lots 3 and 7 were held in joint tenancy at the time of Domenico's death, and that Mary, as surviving tenant, is entitled to an interest in the Alvarez' $80,000 note and deed of trust equal to the sale price thereof, namely, $49,950.

Lot 2.

■ As hereinbefore stated, the title to Lot 2 vested in Domenico on August 2, 1943, approximately 11 years after the marriage. Civil Code section 164 reads in part : ''All other real property situated in this state and all other personal property wherever situated acquired during the marriage by a married person while domiciled in this state is community property, . . .'' The disputable presumption raised by this section is fundamental to the community property system and strong evidence is required to overcome it. *Estate of Jolly* (1925) 196 Cal. 547, 553 [238 P. 353], has greater force in cases where the marriage has been a long-continued relation. (*Estate of Duncan* (1937) 9 Cal.2d 207, 217 [70 P.2d 174].)

The court found, in effect, that the presumption had been overcome by the evidence and held that the property was Domenico's separate property.

■ In *Mason* v. *Mason* (1960) 186 Cal.App.2d 209, at pp. 211-212 [8 Cal.Rptr. 784], it is said : ''The presumption thus created is disputable. and as such is the weakest and least satisfactory form of evidence. (*Estate of McGee,* 168 Cal.App.2d 670, 677 [336 P.2d 622].) Such presumptions 'are allowed to stand, not against the facts they represent. but in lieu of proof of them.' (*Simonton* v. *Los Angeles Trust & Sav. Bank,* 205 Cal. 252, 258 [270 P. 672].) Though plaintiff

argues that 'clear and satisfactory' proof is necessary to defeat the presumption, the *quantum* of proof is generally a matter for the trial court and that court's determination of the factual issues is conclusive on appeal unless the evidence upon which the determination is based is so weak and improbable that the finding is without substantial support. (*Estate of McGee*, 168 Cal.App.2d 670, 677 [336 P.2d 622]; *Estate of Ades*, 81 Cal.App.2d 334 [184 P.2d 1].)''

The evidence in support of the court's determination in the case at bench follows: Michael Casella testified that Lot 2 was purchased by decedent with the proceeds from the sale of the Paula Street property (which was undisputedly the separate property of decedent). Although Michael later weakened and said that he could not be sure where the money for the sale of Lot 2 came from, the trial court could have believed his earlier testimony. Lot 2 was purchased shortly after the Paula Street property was sold. Michael's testimony was further fortified by Mary while she was being cross-examined. While discussing the lots on San Carlos (Lot 2 was one of them) she referred to them as ''His lots on San Carlos Street.'' She further admitted that in discussions with decedent she never said ''our lots,'' but used to say ''. . . They are your lots.'' Moreover, Mary did not testify that there ever was any agreement between the parties that Lot 2 would be considered community property. This evidence supported the court's conclusion.

Mary contends further that the title to Lot 2 (and also to Lot 4, hereinbefore mentioned) was transmutted into community property by the action of the parties in filing separate federal income tax returns for the calendar year 1947 in which one-half of the income therefrom and one-half of the deductions, including expenses, taxes and depreciation attributable to the two lots, were reported one-half on Domenico's return and one-half to Mary's.

Prior to 1948, the income from separate property of a husband had to be reported only on the husband's federal income tax return, whereas, if the separate property was converted to community property, the husband and wife would split the income and have a lower tax bracket and a lower tax. Many individuals converted separate property into community property to obtain these tax savings. Indeed, several eastern states passed community property laws so that their citizens would have the tax benefit resulting at that time for community property. In 1948, the federal income tax law

was amended to allow all married couples to split their income whether it came from separate or community property.

In *Estate of Neilson* (1962) 57 Cal.2d 733 [22 Cal.Rptr. 1, 371 P.2d 745], the court discussed the rebuttable presumption arising from spouses filing separate income returns, saying : "Ines testified that Charles filed joint income tax returns each year of their marriage except 1946 when individual returns were filed. The 1946 returns also split the total income of both spouses. The fact that a husband and wife filed tax returns splitting their income before 1948 is substantial evidence that will support a finding of transmutation. [Citations.] The filing of such returns, however, does not establish transmutation as a matter of law. [Citations.]

"It is presumed that a person obeys the law. [Citations.] Charles and Ines could split their income for tax purposes prior to 1948 only if it was community income or each owned half the property. Their returns were signed under the penalty of perjury and created a disputable presumption that Charles had filed lawful income returns and that his separate property had therefore been transmuted into community property. [Citation.] This presumption can be overcome by evidence that the income splitting represented nothing more than an 'overzealous desire to minimize income taxes.' [Citations.] Such evidence might consist of testimony that the returns were prepared by or upon the advice of a tax expert and the spouses did not understand the significance of reporting income in this manner [citations], or of testimony or documents indicating that the spouses regarded the property as separate property despite the filing of income-splitting returns." (Pp. 744, 745.) ██ It is for the trial court to determine whether a presumption or inference has been overcome by preponderating evidence. (*Price* v. *Price* (1963) 217 Cal.App.2d 1, 10 [31 Cal.Rptr. 350] ; *Thomasset* v. *Thomasset,* 122 Cal.App.2d 116, 123 [264 P.2d 626].)

██ In the instant case the trial court could have believed that decedent and respondent had their income tax returns prepared by an accountant and did not understand the significance of that manner of reporting income. (*Estate of Neilson, supra.*) Domenico solely handled the affairs of the spouses without discussing them with Mary. There is no indication that in having separate tax returns made Domenico thereby intended to convert the properties into community properties. It is significant that Mary at no time testified that the parties agreed or considered that by the income tax

returns for 1947 they were transmuting Domenico's separate property into community property. The court apparently concluded that there was no substantial evidence to find a transmutation and that the separate returns filed for the 1947 taxable year represented nothing more than an overzealous desire to minimize income taxes. (*Estate of Neilson, supra.*) We uphold the court's finding that Lot 2 was Domenico's separate property.

3. The *in terrorem* clause.

The will contains an *in terrorem* clause. The Brothers claim that the judgment purports to distribute to Mary property under the provisions of the will without regard to the effect of that clause. The record fails to disclose that this clause was called to the attention of the court.

■■■ Whether a person has forfeited his rights under a contest clause, or has elected to take under the will instead of asserting community property rights, are matters which must be taken up at the time of final distribution. (See 21 Cal.Jur. 2d, § 824; *Cook* v. *Cook* (1941) 17 Cal.2d 639 [111 P.2d 322].) The court below in its judgment followed section 1081 of the Probate Code, which states in pertinent part that in an heirship proceeding ". . . the court . . . shall determine who are . . . entitled to distribution of the estate and shall specify their interests." Had the question of the effect of the *in terrorem* clause been raised in this proceeding, its raising would have been premature. It may be considered at the time of distribution.

The judgment is affirmed except as to that portion determining that the $1,818.90 savings account at Pioneer Investors Savings and Loan Association is separate property of the estate. That portion of the judgment is remanded to the probate court with directions to decree that Mary, as surviving tenant, is the sole and absolute owner of the whole of the account. The appeal from the "memorandum and order" filed on May 14, 1965 is dismissed.

Each party will bear his own costs.

Draper, P. J., and Salsman, J., concurred.

The petitions for a rehearing were denied December 22, 1967, and the petitions of all the appellants for a hearing by the Supreme Court were denied January 17, 1968.