IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2002 Session

# CHARLES B. WATSON v. MARGARET O. WATSON ASHLEY, ET AL.

**Appeal from the Circuit Court for Franklin County**
**No. 11692-CV      Thomas W. Graham, Judge**

---

### No. M2001-00668-COA-R3-CV - Filed June 13, 2002

---

In this action to set aside a deed, the Circuit Court of Franklin County held that the deed had been procured by persons in a confidential relationship with the grantor and that the presumption of undue influence had not been rebutted by clear and convincing evidence. We affirm the trial court's action in setting aside the deed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and HAMILTON V. GAYDEN, SP. J., joined.

William E. Simms, Fayetteville, Tennessee, for the appellants, Margaret O. Watson Ashley, Jerry D. Ashley, Jarrett D. Ashley, Jana Ashley Smith, Timmy Smith, Ruby Elliott Watson, and Margaret O. Watson Ashley, Executrix of the Estate of Clyde E. Watson, deceased.

Mark Stewart, Winchester, Tennessee, for the appellee, Charles B. Watson.

**OPINION**

**I.**

In 1979 the plaintiff, Charles B. Watson, his brother, Clyde E. Watson, and their mother, Vicie A. Watson, bought an eighty-five acre farm in Franklin County. The mother died in 1987 and devised the property to the two boys equally. Both brothers later married. They had four sisters and numerous nieces and nephews.

On February 22, 1993, Charles Watson signed a warranty deed conveying his interest in the eighty-five acre tract to Clyde, subject to a life estate which Charles Watson retained. On the same date he signed a power of attorney making his sister Margaret his attorney in fact. Apparently on the same day, he executed a will leaving one-third of his property to his wife and two-thirds to his

brother Clyde. The will provided that if Clyde predeceased Charles then Clyde's share would go to Margaret's children. Margaret was named executrix of the will. The documents were all signed at the office of attorney Mike Lynch in Winchester. Charles testified that he went to Mr. Lynch's office in the company of Clyde and Margaret and that they told him he needed to sign some papers related to their mother's estate. Margaret took all the documents with her. After she recorded the deed, she placed all the documents in her safe at home.

Charles Watson cannot read with any comprehension. He attended school to the third grade when he quit to work with his father. He has worked at a sawmill, as a farmer, hauling garbage, and driving a truck for the county highway department. In order to obtain a license to drive the county truck, Charles had to memorize the questions with the help of his supervisor and take the examination orally. On a test to determine his mental abilities, Charles scored an IQ of 61. He functions at a level of six years and one month and is necessarily dependent on others in any situation that involves words outside his vocabulary. The person administering the competency tests said that he did not believe Charles could review and understand a deed without assistance

Clyde died on May 20, 1999. His will left his house and one acre of land to his widow for life, a five acre plot to one niece, and the remainder of the farm to two of Margaret's children.

On September 13, 1999, Charles sued to set aside the deed conveying his interest in the remainder of the eighty-five acre tract to his brother Clyde. The complaint alleged that the deed was procured by fraud, by undue influence, or by trick, relying on his limited education and comprehension. After a hearing on the merits, the trial judge set aside the deed, finding that when the deed was signed Clyde and Margaret stood in a confidential relationship to Charles and that they both had profited from the transaction. In addition, the court held that the proof failed to overcome the presumption of undue influence raised by the confidential relationship.

## II.

### A. MARGARET

The trial court held that the unrestricted power of attorney given to Margaret on February 22, 1993 in and of itself created a confidential relationship between her and Charles. That holding was based on the Supreme Court's opinion in *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995), where the court said that a confidential relationship existed as a matter of law where the dominant party held the other party's unrestricted power of attorney. In a more recent opinion, the Supreme Court has modified that holding and the court now says that an unexercised power of attorney of which the dominant party was unaware at the time he/she received a benefit from the other party, does not establish a confidential relationship. *Childress v. Currie*, No. W1999-00471-SC-R11-CV, 2000 Tenn. LEXIS 194 (Tenn. May 3, 2002).

We are of the opinion, however, that the facts in this case do show that a confidential relationship existed between Margaret and Charles. Although she apparently did not exercise it,

Margaret certainly knew of the power of attorney. She was in the room when it was first discussed (although she disclaims any part in bringing it about); she was back at the lawyer's office when it was executed, and she took it home and put it in her safe. In addition, she testified at length about how she took care of Charles and Clyde while they lived at home before either of them married. She said, "anything they needed, they called on us and we were there." Charles called on her many times to take him to the doctor and she stayed with him every day when he was in the hospital. The power of attorney gave Margaret the authority to write checks on Charles' back account, to sell any property he had, to borrow money on his behalf, and to make disbursements "for any purpose for which she might see fit and proper in [his] name and stead." We think the trial judge was correct in concluding that Margaret stood in a confidential relationship with Charles.

### B. CLYDE

The trial judge also held that a confidential relationship existed between Charles and his brother Clyde. This conclusion was based on proof that the brothers engaged in the farming business together and that Clyde was the dominant party. Another sister testified that Charles never did anything on his own, somebody always told him what to do. After his mother died the person he depended on was his brother Clyde, although Clyde's education was also very limited. Charles himself testified that Clyde made most of the decisions. For instance, if they bought a front end loader or other piece of farm equipment, Clyde would just announce that that was what they were going to do and he (Charles) went along with it.

A confidential relationship is one that gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384 (Tenn. Ct. App. 1989). It is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

Under the circumstances of this case, we think the trial judge was correct in concluding that Charles Watson's relationship with his brother Clyde gave Clyde the opportunity to exercise dominion and control over him. Charles' limited education and cognitive ability made him dependent on others – especially in the areas where written documents were concerned. He had one brother; they worked together and owned property together. His brother then was the natural recipient of Mr. Watson's trust and confidence.

The appellants complain that the evidence on which Mr. Watson relies to establish the confidential relationship should have been excluded under Tennessee's version of the Dead Man's Statute, Tenn. Code Ann. § 24-1-203. The statute, however, does not apply to statements made by non-parties, *Gibson v. Parkey*, 217 S.W. 647, 648 (Tenn. 1919), nor to statements by a party as to transactions with the decedent that do not increase nor diminish the decedent's estate. *Cantrell v.*

*Estate of Cantrell*, 19 S.W.3d 842, 846 (Tenn. Ct. App. 1999). Therefore, Charles could testify about how he related to his brother, how they did business together, and who made the decisions. These transactions would not affect the size of Clyde's estate. Further, the statute would not affect the testimony of the sister.

## III.

### REBUTTAL EVIDENCE

Once a confidential relationship has been shown, a presumption of undue influence arises. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). This presumption may be rebutted, but it requires clear and convincing evidence to do so. *Id.* One way to rebut the presumption is to show that the weaker party received independent advice before engaging in the transaction, *see Hagan v. Cooper*, 619 S.W.2d 516 (Tenn. 1981), and the appellees argue that Charles got independent advice from Mr. Lynch when he executed the various documents on February 22, 1993. Mr. Lynch, however, did not remember any of the details of how the documents were executed. He could only relate what he customarily did under the circumstances. Against Charles' testimony that Margaret told him that they needed to execute some papers in order to probate their mother's will and his testimony that no one explained to him what the documents were, the evidence is not clear and convincing that the transactions were free of undue influence.

Margaret also argues that she did not receive any benefit from the deed, so the fact that she might have been in a confidential relationship with Charles is immaterial. We think that argument overlooks two critical points. First, we think that it is significant that the ultimate beneficiaries of the transaction were members of her family. But beyond that, a deed procured by undue influence is nevertheless voidable even if it is procured for someone other than the dominant party. *See* 23 Am. Jur. 2d *Deed*s § 181 (2002); *Reynolds v. Molitor*, 440 A.2d 192 (Conn. 1981); *Agner v. Bourn*, 161 N.W.2d 813 (Minn. 1968). In *Morris v. Berman*, 324 P.2d 601, 613 (Cal. Ct. App. 1958), the Court said:

> [A] gift, grant, or bequest procured by undue influence is vitiated thereby, and it is immaterial that in the procurement thereof the immediate beneficiary did not participate.

*Morris*, 324 P.2d at 613 (quoting 96 A.L.R. at 613).

If Clyde was in a confidential relationship with his brother Charles, the question is moot. But even if he were not, and Margaret was, the deed can be set aside because of her undue influence.

# IV.

## STATUTE OF LIMITATIONS

The appellants assert that the action to set aside the deed is barred by the three-year statute of limitations in Tenn. Code Ann. § 28-3-105 applicable to injuries to property. We think, however, that the statute of limitations applicable to an action to set aside a deed is the ten-year statute found in Tenn. Code Ann. § 28-3-110. *See Killibrew v. Ray*, 181 S.W.2d 334, 340 (Tenn. 1944). The trial judge also held that Charles did not discover the conveyance until well within the statute of limitations (assuming that the three-year statute applied). We think the evidence supports that conclusion, although the evidence is not uncontroverted. Charles testified that he did not understand or realize what he had signed until after the death of his brother in 1999. One of his sisters corroborated that evidence and the trial judge apparently accepted it as true. The trial judge has to assess the credibility of the witnesses, and that assessment is entitled to great weight on appeal. *Town of Alamo v. Forcum-James Co.*, 327 S.W.2d 47, 50 (Tenn. 1959).

# V.

## RATIFICATION OR ESTOPPEL

The appellants also argue that Charles ratified the transaction or that equitable estoppel should bar his claim for cancellation. With respect to estoppel, we think the lower court's finding of a confidential relationship raising the unrebutted presumption of undue influence is a complete answer to that contention. Margaret individually or as executrix of Clyde's estate cannot sustain a claim that Charles misled her or Clyde if the transaction was procured through their undue influence. A false representation or the concealment of material facts must appear in order to make out a case of equitable estoppel. *Roach v. Renfro*, 989 S.W.2d 335, 339 (Tenn. Ct. App. 1998).

With respect to ratification, we are not sure that this argument was ever presented to the trial court. Nevertheless, the facts found by the trial judge contain implicit findings that Mr. Watson did not know that he had executed a deed to his share of the farm and that he did not discover that fact until at or about the time of his brother's death. Again, these facts result from the trial judge's assessment of the credibility of the witnesses. Therefore, we will not disturb those facts on appeal.

The judgment of the court below is affirmed and the cause is remanded to the Circuit Court of Franklin County for any further proceedings necessary. Tax the costs on appeal to the appellants.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.